Wardell RILEY, Petitioner-Appellant,

v.

Louie L. WAINWRIGHT, et al.,
Respondent-Appellee.

No. 84–5522.

United States Court of Appeals,
Eleventh Circuit.

Dec. 11, 1985.

Rehearing and Rehearing En Banc
Denied Jan. 17, 1986.

Mark F. Kelly, Frank, Kelly & McKee, P.A., Tampa, Fla., for petitioner-appellant.

Jack B. Ludin, Asst. Atty. Gen., Dept. of Legal Affairs, Miami, Fla., for respondent-appellee.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Wardell Riley is a Florida death row inmate. He petitioned the district court for a writ of habeas corpus setting aside two first-degree murder convictions and a conviction for assault with intent to commit first-degree murder. The district court denied habeas relief, and Riley appealed. We affirm.

## I.

### A.

Wardell Riley became employed as a delivery truck driver for Sunset Bottling Company (Sunset), located in Miami, in May 1975. The events in question took place on Monday, September 15, 1975. At the time, Sunset was owned and operated by Peter Enea and his son, Peter Enea, Jr. Robert Lisenby was Sunset's supervisor of truck drivers. Enea, Jr. is the sole survivor of the acts for which Riley was convicted and was the State's only eye witness.

Shortly after Riley began to work for Sunset, Enea and Enea, Jr. began a practice of picking him up on their way to work in the morning. For reasons not appearing in the record, Riley was not on the job several days during the week prior to September 15, and the Eneas did not pick him up on that date. Riley called Sunset's office on the morning of September 15 and asked if he should come in. Enea, Jr. called him back and told him that he could report to work. Riley reported for work and was the last driver to check in at Sunset's plant office at the end of the day. When he arrived at the office he was accompanied by a man known only as Jerome.[1] According to Enea, Jr., while his father was checking Riley in, Lisenby appeared with his hands in the air; Jerome was behind him with a gun. Jerome fired two random shots into the air. Riley pulled a gun from under his shirt and fired two more random shots. Riley then instructed Enea, Enea, Jr., and Lisenby to lie on the floor.

Enea and Enea, Jr. lay face down on the floor in an "L shape" with their heads about a foot and a half apart. Lisenby lay down somewhere below Enea, Jr.'s feet. Riley bound and gagged the two Eneas and removed Enea, Jr.'s .25 caliber pistol and other valuables from his pockets. Riley then ransacked the office. Enea, Jr. saw Riley return to where the men were lying and step over his father. While Riley was standing between the Eneas, Enea, Jr. heard a shot fired and saw his father's head come off the floor. He did not see who actually fired the shot, but could see Riley's shoes and the bottom of his pants. Enea, Jr. heard a second shot, which struck him in the head, and then a third shot.

After some time passed, Enea, Jr., believing that Riley and Jerome had left, rose from the floor, cut the ropes binding his hands, and telephoned the police. He next went to a file cabinet where he obtained Riley's identification card. When the police arrived, he gave them the card and stated that the man identified on the card worked

---

1. Enea, Jr. testified that Riley had picked up Jerome during the day to assist him as a "helper," something that apparently was not uncommon. Riley testified that Sunset had hired Jerome as a new driver and that Enea, Jr. had assigned him to Riley for training that day. This dispute in the testimony is not critical to this appeal.

for Sunset and had shot his father. Enea, Jr. was taken to the hospital, and he survived. Nothing could be done for Enea, Sr. and Lisenby; both died from their gunshot wounds.

The police found five .38 caliber bullets and one .25 caliber cartridge casing at the scene of the shooting. A .22 caliber bullet was removed from Lisenby's head. The police arrested Riley at his home in the early morning of September 16. They subsequently searched his home and found the pants and boots he wore on September 15, nine .22 caliber bullets, and six .25 caliber bullets. The murder weapons were never found. Seven of the nine .22 caliber bullets were of the same manufacture as the .22 caliber bullet removed from Lisenby's head. All six of the .25 caliber bullets were produced by the same manufacturer as the .25 caliber cartridge casing the police discovered at the murder scene. The pants and boots disclosed minute amounts of blood. Because of the small amount of blood involved, the police laboratory was unable to draw any conclusion other than the presence of human blood.

### B.

Riley was indicted by a Dade County grand jury on October 7, 1975. The indictment charged him with two counts of first-degree murder and one count of assault with intent to commit murder in the first degree. Riley went to trial before a jury on February 10, 1976. The jury convicted him as charged four days later.

Peter Enea, Jr. testified for the prosecution and related the events we have described. The State also presented several expert witnesses. A blood analysis expert testified that he found a small amount of human blood of unknown type on Riley's left shoe and pants. Medical experts testified as to the victims' cause of death and the nature of the wounds they received. A firearms and ballistics expert testified as to the items found at the scene and at Riley's residence, noting the similarity of manufacturer of the bullets.

Riley was represented at trial by Frederick Robbins.[2] Robbins did not employ his own experts, but relied on the assistance of Jack Karkowski, a former police officer with some knowledge of ballistics, to prepare his cross-examination of the State's experts. Robbins was able to get the State's ballistics expert to admit that the .22 caliber bullet found in Lisenby's head could have been a .22 long rifle, a .22 long, or a .22 short. The .22 caliber bullets found at Riley's home were long rifle and long. The ballistics expert therefore could not say that the bullets were the same. He also conceded that the bullets were very common and available at any gun store. The expert admitted that the manufacturer's markings on the .25 caliber cartridge casing found at the murder scene and the casings of the .25 caliber bullets uncovered at Riley's residence were somewhat different, meaning that the bullets may have come from different boxes. In addition, these bullets were very common and readily available. The State's medical expert testified that a bullet wound such as the one Enea, Sr. received would have caused a back splatter of blood. Robbins was able to argue that the small amount of blood found on Riley's clothes made it unlikely that he had shot Enea, Sr.

Riley's defense was an alibi. Riley took the stand and testified that he left the Sunset plant prior to the shooting. At that time, the Eneas and Lisenby were still working. Riley explained away the small amount of blood on his clothing by stating that he had probably cut himself handling fragile glass items, something that frequently occurred on the job. Riley also

---

**2.** Robbins was initially hired by Riley's family. When the family was unable to continue paying for his services, Robbins was appointed Riley's counsel by the court.

provided an innocent explanation for the bullets found at his home.[3]

On February 16, following a sentencing hearing before the jury on Riley's first-degree murder convictions, the jury recommended that Riley be sentenced to death for the murder of Enea, Sr. and sentenced to life imprisonment for the murder of Lisenby. The trial court accepted the jury's recommendations and sentenced Riley accordingly. The court also sentenced Riley to fifteen years imprisonment for the assault upon Enea, Jr.

On direct appeal, the Florida Supreme Court affirmed Riley's convictions, but it set aside his death sentence because the trial judge had considered aggravating circumstances not provided for by statute. *Riley v. State*, 366 So.2d 19 (Fla.1978) (per curiam).[4] The court therefore remanded the case "for the sole purpose of allowing the trial judge to reconsider the imposition of the death sentence for the murder of Peter Enea, Sr." *Id.* at 22.

Following his receipt of the supreme court's mandate and after notice to Riley, the trial judge held a second sentencing hearing. Riley was now being represented by an assistant public defender. After receiving evidence from the State and from Riley, the court concluded that the aggravating circumstances continued to outweigh the mitigating circumstances[5] and imposed a sentence of death. Riley appealed to the Florida Supreme Court.

On appeal, Riley challenged his death sentence on two grounds, both rooted in the previous sentencing proceeding before the jury. Riley's first ground was that the prosecutor, in his closing argument, urged the jury to consider aggravating circumstances not recognized by Florida law. His second ground was that the trial judge compounded this error by failing to instruct the jury not to consider these inappropriate aggravating circumstances. These dual errors, according to Riley, rendered the jury's death sentence recommendation invalid under Florida law and the United States Constitution. The Florida Supreme Court rejected Riley's claims because he failed seasonably to present them

---

3. Riley testified that he had purchased some of the bullets for use in hunting and that some had been left in the house by its previous occupant.

4. Fla.Stat. § 921.141(5) (1975) provided for the consideration of only the following aggravating circumstances:

 (a) The capital felony was committed by a person under sentence of imprisonment.

 (b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

 (c) The defendant knowingly created a great risk of death to many persons.

 (d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

 (e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

 (f) The capital felony was committed for pecuniary gain.

 (g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

 (h) The capital felony was especially heinous, atrocious, or cruel.

The trial judge found six aggravating circumstances. Two of these, Riley's lack of remorse and the great length of premeditation involved in the crime, were not among those permitted by the statute. *Riley v. State*, 366 So.2d at 21 n. 2. The judge also erroneously applied the "especially heinous, atrocious, or cruel" aggravating circumstance. *Id.* at 21. In addition, the fact that the murder was committed for pecuniary gain and during the course of a robbery was improperly considered as two aggravating circumstances. These findings did appropriately constitute one aggravating circumstance. *Id.* The Florida Supreme Court upheld the trial judge's finding that the murder was committed to eliminate a witness and thereby avoid lawful arrest. *Id.* at 21–22.

5. The court found two aggravating circumstances: the murder was committed during the commission of a robbery for pecuniary gain, and the murder was committed for the purpose of avoiding a lawful arrest. The court noted one mitigating circumstance: Riley's lack of a history of criminal activity.

to the trial judge at the time the alleged errors occurred or raise them at the second sentencing hearing. *Riley v. State*, 413 So.2d 1173, 1174 (Fla.) (per curiam), *cert. denied*, 459 U.S. 981, 103 S.Ct. 317, 74 L.Ed.2d 294 (1982).[6] The supreme court then stated that, even if Riley's claims were properly before it, no error had occurred. The court accordingly affirmed the second death sentence. *Id.* at 1174–75.

On May 12, 1983, the Governor of Florida signed a death warrant for Riley. On May 23, Riley moved the sentencing court to vacate his three convictions and sentences pursuant to Fla.R.Crim.P. 3.850. His motion was denied on May 27. Riley petitioned the Florida Supreme Court for a writ of habeas corpus the same day. On May 31, he took an appeal to the Florida Supreme Court from the trial court's denial of his Rule 3.850 motion. On June 1, Riley petitioned the Florida Supreme Court for leave to apply for a writ of error coram nobis. The supreme court consolidated Riley's three pending actions and denied relief in each instance. *Riley v. State*, 433 So.2d 976 (Fla.1983) (per curiam).

On June 3, 1983, Riley petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1982). He subsequently amended his petition to allege thirteen separate constitutional claims.[7] The district court conducted evidentiary hearings on one of Riley's claims, that he had received ineffective assistance of counsel, and heard arguments of counsel on the others. On June 11, 1984, the district court rejected each of Riley's claims and dismissed his petition for habeas relief.

In this appeal, Riley pursues two of the claims he presented to the district court. The first is that his trial attorney failed to provide effective assistance of counsel at both the guilt and sentencing phases of his jury trial. The second is that the state trial court violated the eighth and fourteenth amendments when it imposed the second death sentence without first submitting the case to a new advisory jury.

## II.

Riley claims that his trial counsel was ineffective because he failed adequately to pursue three matters at the guilt and sentencing phases of his trial. First, counsel failed to obtain the testimony of experts in the blood splatter and forensic medicine fields. Riley represents that this testimony would have shown that the person who shot Enea, Sr. would necessarily have been sprayed with a substantial quantity of blood. Second, counsel failed to obtain ex-

---

6. The court also noted that Riley failed to raise the claims in his first direct appeal. *Riley v. State*, 413 So.2d at 1174.

7. Riley claimed that his fifth, sixth, eighth, and fourteenth amendment rights were violated in the following respects: (1) the trial judge's instructions to the jury precluded their consideration of all mitigating circumstances at the sentencing phase; (2) the trial judge wrongfully excluded several veniremen as potential jurors because of their opposition to the death penalty; (3) the trial judge wrongfully denied him a new advisory jury at resentencing; (4) the Florida Supreme Court denied him meaningful appellate review and his right to confront evidence presented against him by considering non-record information in passing on his convictions and death sentence; (5) his trial attorney provided him ineffective assistance of counsel; (6) the Florida Supreme Court denied him a full and fair hearing on his petition for a writ of error coram nobis; (7) the judge's instructions

at the sentencing phase of his trial failed adequately to guide the jury in assessing the statutory aggravating circumstances; (8) the trial judge failed to instruct the jury at the sentencing phase that, if it split six-six on its sentence recommendation, its action would constitute a life imprisonment recommendation; (9) the trial judge erroneously instructed the jury on all statutory aggravating circumstances regardless of whether evidence existed to support them; (10) the trial judge erroneously instructed the jury on all lesser offenses regardless of whether evidence existed to support them; (11) the trial judge failed to instruct the jury at the sentencing phase that the aggravating circumstances must outweigh the mitigating circumstances to support a death sentence recommendation; (12) the trial judge, in imposing Riley's death sentence, failed to consider and weigh non-statutory mitigating circumstances; and (13) the death penalty in this case is a disproportionate punishment.

pert testimony in the ballistics field. This testimony, Riley contends, would have negated any connection between the bullets found at the Sunset plant and those found at his home. Finally, counsel failed to bring before the jury a statement contained in a deposition he took from Detective Eddie Bradham. The statement indicated that, when Bradham interviewed Enea, Jr. in the hospital shortly after the shooting, Enea, Jr. identified Riley's accomplice, Jerome, not Riley, as the person who actually shot his father. We consider these matters separately in the context of the guilt and the sentencing phases of the trial.

### A.

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), sets forth the standard for assessing claims that defense counsel failed to provide constitutionally effective assistance. A habeas petitioner must satisfy a two-prong test. First, he must show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at ——, 104 S.Ct. at 2065. This requires that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at ——, 104 S.Ct. at 2066. Second, the petitioner must prove that counsel's deficient performance prejudiced him. *Id.* at ——, 104 S.Ct. at 2064. Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at ——, 104 S.Ct. at 2068.

█ Applying the *Washington* standard to the case at hand, we conclude that Riley has not established a right to relief based upon the ineffectiveness of his counsel at the guilt phase of the trial. Preliminarily, it is important to note that the most crucial aspect of this phase of the trial involved the eye witness testimony of Enea, Jr. which unequivocally identified Riley as one of the co-perpetrators of the crimes in question. Riley's defense was one of alibi. Accordingly, defense counsel's main thrust was to attempt to bolster Riley's version of the events and cast doubt upon Enea, Jr.'s version.

We turn first to the matter of the blood splatter. Defense counsel was able to elicit testimony from the State's medical expert regarding this phenomenon and point out to the jury the fact that Riley's clothing did not contain a large quantity of blood. Counsel's decision not to buttress this point by presenting additional testimony from a defense expert was well within the "range of professional competent assistance" and caused Riley no prejudice.

The ballistics matter requires a similar disposition. Through cross-examination of the State's ballistics expert, Riley's attorney was able to raise doubts as to whether the bullets found at Riley's home bore any relation to those found at the Sunset plant. Counsel had assistance in this area from a former police officer knowledgeable in ballistics. His failure to provide cumulative testimony from a defense ballistics expert was not an unreasonable choice and did not prejudice Riley's case.

Counsel's failure to put Detective Bradham's deposition testimony before the jury also does not demonstrate ineffectiveness under the *Washington* standard. Regardless of whether counsel's failure to make use of this testimony was reasonable,[8] Riley has not shown the prejudice requisite to

---

8. Robbins, Riley's trial attorney, testified at the evidentiary hearings held by the district court on Riley's petition for a writ of habeas corpus. He first testified on July 6, 1983. When the matter of Enea, Jr.'s statement to Bradham in the hospital came up, Robbins could not recall it, but conceded that there was no trial strategy involved in failing to use the statement. He admitted that the point was an important one that he would have brought out had he been aware of it at the time. When Robbins testified at a subsequent hearing on July 25, he offered

relief. Assuming that Enea, Jr.'s statement to Bradham in the hospital would have been admissible through Bradham's deposition testimony,[9] the most that it could have accomplished would have been to cast some doubt on Enea, Jr.'s testimony at trial indicating that Riley fired the shot that killed his father. Enea, Jr.'s statement to Bradham would not, however, have damaged his identification of Riley as one of two participants in a crime that left two men dead and one wounded. Under Florida law, participation in a felony murder constitutes murder in the first degree, a capital felony.[10] Riley has therefore failed to establish prejudice that would "undermine confidence in the outcome" of his trial. *See Strickland v. Washington,* 466 U.S. at ——, 104 S.Ct. at 2068.

### B.

Riley alleges that trial counsel was ineffective for not pursuing the same matters

possible strategic reasons for not using Bradham's deposition.

Plausible strategic reasons for not utilizing the deposition do exist. Evaluating counsel's conduct from the perspective of the time it occurred rather than in hindsight, *see Strickland v. Washington,* 466 U.S. at ——, 104 S.Ct. at 2065–66, one concludes that Riley's alibi defense made the issue of his presence at the time of the murders paramount. Counsel may have felt that pursuing a line of inquiry as to which perpetrator, Riley or Jerome, actually pulled the trigger *might be counterproductive and needlessly focus attention on Riley's presence at the scene.* Making use of the deposition statement could also have paved the way for the State to rehabilitate Enea, Jr. with damaging evidence, for example a prior consistent statement, otherwise inadmissible, that Riley was the one who shot his father.

9. The statement by Enea, Jr. to Bradham would have constituted hearsay if offered to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c). None of the recognized exceptions to the hearsay rule appear applicable to this statement. It is therefore likely that the statement would have been inadmissible to prove the truth of the matter asserted. The statement may have been admissible solely to impeach Enea, Jr. *See* Fed.R.Evid. 613(b). This would have required counsel to afford Enea, Jr. an opportunity beforehand to explain or deny the statement. *Id.* Because we have no idea what Enea, Jr.'s testimony would have been in this regard, it becomes almost impossible to assess any preju-

described in Part II.A., *supra,* at the penalty phase of his trial. As previously described, an advisory jury recommended that Riley be sentenced to death for the murder of Enea, Sr. The trial judge accepted that recommendation. The Florida Supreme Court vacated Riley's death sentence and remanded the case for resentencing. *Riley v. State,* 366 So.2d 19 (Fla.1978) (per curiam). Upon remand, the trial judge again decided to impose the death sentence.

 Riley now complains that his attorney provided him ineffective assistance during the initial sentencing proceeding, which was rendered a nullity when the Florida Supreme Court vacated the death sentence it produced.[11] Upon remand, Riley had ample opportunity to present the three pieces of evidence he says his attorney should have presented to the advisory jury and the trial judge earlier. Riley

dice that might have resulted from counsel's failure to use the statement for impeachment. Riley did not attempt to establish, at the hearings before the district court, how Enea, Jr. might have responded to this line of inquiry and thus whether he would have been subject to impeachment with his statement to Detective Bradham. We are also in the dark as to what evidence the State might have been able to adduce to rehabilitate Enea, Jr.'s trial testimony indicating that Riley was the one who shot his father. For all we know, such evidence could have been very damaging to petitioner.

10. Fla.Stat. § 782.04(1)(a)(2)(d), (e) (Supp.1984) provides that: "The unlawful killing of a human being: ... When committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any: ... robbery [or] burglary ... is murder in the first degree and constitutes a capital felony...."

11. The issue of ineffectiveness of counsel during the first sentencing hearing is not relevant in this case because the sentence resulting from that hearing was vacated and is not under attack. *See Raulerson v. Wainwright,* 732 F.2d 803, 809 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984). The trial judge, at the second hearing, considered the evidence and decided to reimpose the sentence of death *independent* of the advisory jury's recommendation.

could have asked the trial court to impanel a new advisory jury to receive this omitted evidence. He did not ask for an advisory jury though, choosing instead to present his evidence to the trial judge alone.[12] Although he did not put forth the specific evidence now in question, Riley was not prevented from doing so.[13] A full-blown opportunity having been accorded, petitioner must concede that any ineffective assistance his trial attorney may have provided at the initial sentencing proceeding could not have caused him any prejudice.[14]

### III.

■ Riley's final claim is that he was entitled to a second advisory jury recommendation because the prosecutor argued erroneous aggravating circumstances to the initial advisory jury and the trial court's instructions failed to remedy this error. As we have pointed out, however, the death sentence resulting from the first sentencing proceeding was vacated by the Florida Supreme Court and the case was remanded for resentencing. Upon remand, Riley was free to ask the trial judge to impanel a new advisory jury.[15] The granting of such a request would have provided

all of the relief sought here. Instead, Riley chose to present his case to the trial judge. He cannot claim that the trial judge wrongfully denied him a second advisory jury when he did not ask for one. When Riley's sentence was vacated and his case remanded, he was granted full relief—the opportunity to present his case free from any errors that may have affected the initial sentencing proceeding.[16]

■ Riley's claim that he is entitled to a second advisory jury recommendation also must fail under the principles established in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The first time Riley claimed that the prosecutor and trial court had committed error before the advisory jury was in his appeal to the Florida Supreme Court from the reimposition of his death sentence. The supreme court rejected Riley's claims of error on a procedural ground, holding that his failure to raise them at trial or at his second sentencing hearing precluded him from raising them in that appeal. *Riley v. State,* 413 So.2d at 1174.[17] Where the petitioner has committed a procedural default that prevents state court review of his objection, federal habeas review will also be barred absent a

---

**12.** Petitioner called several witnesses who testified as to his character, devotion to family, educational background, religious beliefs, and ability to become a constructive member of a prison population if given a life sentence.

**13.** Riley has not alleged that the attorney representing him at the second sentencing hearing provided ineffective assistance.

**14.** We have not addressed the issue of the reasonableness of counsel's performance during the initial sentencing proceeding because the sentence resulting from that proceeding was vacated and the petitioner was granted a new sentencing hearing and an opportunity to put forth any mitigating evidence he had. We note, however, that much of what was said in Part II.A., *supra,* is equally applicable here. The forensic and ballistics evidence that petitioner claims his trial attorney should have presented at the earlier proceeding is largely cumulative of what counsel was able to elicit from the State's witnesses and the value of the Bradham deposition to petitioner's case is highly questionable. *See supra* note 9.

**15.** The Florida Supreme Court's mandate required the trial judge to reconsider the death sentence. *Riley v. State,* 366 So.2d 19, 22 (Fla. 1978) (per curiam). It would appear to have been well within that mandate for the trial judge to convene a second jury to provide advice for the required reconsideration.

**16.** Allegations of error during the initial sentencing proceeding became meaningless when that sentence was vacated and on remand the trial judge independently determined that a sentence of death should be imposed because the aggravating circumstances outweighed the mitigating circumstances. *See supra* note 11.

**17.** The court continued its discussion of Riley's claim, stating that "even if this issue was properly before us, we would find that Riley has failed to demonstrate that the jury's recommendation was tainted." 413 So.2d at 1174.

showing of cause and prejudice. *Wainwright v. Sykes*, 433 U.S. at 86–87, 97 S.Ct. at 2506–07.[18]

It is clear that Riley has not established cause for failing seasonably to present his claims to the Florida courts or resulting prejudice. Although he has attempted to show cause by alleging that his trial attorney was ineffective for not objecting to the prosecutor's argument or the court's instructions to the advisory jury, Riley has made no attempt to explain why his new attorney did not raise the points at resentencing and seek to remedy the error by requesting a new advisory jury proceeding. As we have observed, Riley had an opportunity to ask for a new advisory jury before the court resentenced him. He chose instead to proceed before the trial judge alone and thus cannot now claim error because the judge did not provide a second advisory jury.

### IV.

We have considered the two claims petitioner has presented in this appeal and have found no violation of the Constitution or laws of the United States. Accordingly, the order of the district court denying the petition for a writ of habeas corpus is

AFFIRMED.

**18.** In this instance, the state court held that because of his procedural default, Riley "cannot now raise this point on appeal." 413 So.2d at 1174. The court went on to say that it would reject Riley's claim on the merits if the issue was properly presented. *See supra* note 17.

We have held, however, that where a state court clearly and correctly applies a procedural default rule, *Sykes* requires the federal court to abide by the state court's decision even though the state court discusses the merits as an alternate ground for rejecting a claim. *Ratcliff v. Estelle*, 597 F.2d 474, 478 (5th Cir.), *cert. denied* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). Appellate courts often decide an issue in the alternative with no intention of abandoning any available

ground for decision. The problem here, however, is discerning whether the waiver rule has been applied and the merits discussed only in the alternative, or whether the procedural ground is mentioned only in passing and the merits form the basis of the state court's decision.
*Dobbert v. Strickland*, 718 F.2d 1518, 1524–25 (11th Cir.1983) (per curiam). There is no doubt that the state court applied the waiver rule in this instance, merely mentioning the merits as an alternative. *See also Riley v. State*, 433 So.2d 976, 979 (Fla.1983) (similar disposition in state collateral proceeding).