David W. TROEDEL, Petitioner,

v.

Louie L. WAINWRIGHT, Secretary,
Florida Dept. of Corrections,
Respondent.

No. 85–3690–CIV.

United States District Court,
S.D. Florida.

Sept. 23, 1986.

Steve Malone, Office of the Capital Collateral Representative, Tallahassee, Fla., for petitioner.

Peggy Quince, Office of Atty. Gen., Tampa, Fla., for respondent.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

KEHOE, District Judge.

Pursuant to Title 28, United States Code, Section 2254, Petitioner David W. Troedel ("Troedel") filed a writ of habeas corpus seeking to set aside his convictions and death sentences on a number of constitutional grounds. The State of Florida filed a timely response and supplemental response, to which Troedel replied. Pursuant to this Court's order of January 16, 1986, Troedel was permitted to propound limited discovery.

The trial court summarily denied Troedel's motion to vacate his judgments and sentences, pursuant to Fla.R.Crim.P. 3.850. The Florida Supreme Court affirmed the denial and summarily denied Troedel's original petition for writ of habeas corpus. Thereafter, this Court, pursuant to *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), ordered that an evidentiary hearing be held with respect to points III, IV and V raised in the petition. The

evidentiary hearing was conducted on March 26, 1986, at which time the Court also entertained argument of counsel on the remaining issues. The essential facts of this case are set out in *Troedel v. State,* 462 So.2d 392, 394–96 (Fla.1984).

After consideration of the respective memoranda of law, argument of counsel and testimony presented at the evidentiary hearing, the Court has determined that several of the grounds raised in the petition relating to the fairness of Troedel's trial and sentencing are meritorious and, therefore, require that the convictions and sentences be vacated and the cause be remanded for a new trial. Accordingly, it is unnecessary for this Court to address Troedel's additional challenges concerning the Florida Supreme Court's review of his death sentences.

### I.

### PROSECUTION'S USE OF MISLEADING TESTIMONY

Troedel argues that both the guilt and sentencing phases of his trial were rendered fundamentally unfair as a result of the State's presentation of false or misleading evidence (in the nature of expert testimony) to the jury.

The law is firmly established that the fourteenth amendment to the Constitution of the United States cannot tolerate a state criminal conviction obtained by knowing use of false evidence or improper manipulation of material evidence. *U.S. v. Bagley,* 473 U.S. 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. U.S.,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Brown v. Wainwright,* 785 F.2d 1457 (11th Cir.1986). The term "false evidence" includes the "introduction of specific misleading evidence important to the prosecution's case in chief [or] the nondisclosure of specific evidence valuable to the accused's defense." *Donnelly v.*

*DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974).

■ In order to prevail on this issue, Troedel must establish that (1) the testimony was in fact misleading, (2) the prosecution knowingly used said testimony and (3) the subject testimony was material to his guilt or innocence. *Brown v. Wainwright,* 785 F.2d at 1463; *Williams v. Griswald,* 743 F.2d 1533, 1542 (11th Cir.1984).

### A. *False or Misleading Evidence*

■ This question centers on the *trial* testimony concerning gunpowder residue offered by the prosecution's expert witness, John Riley, who testified that, in his "expert" opinion, Troedel had fired the murder weapon.

Prior to the trials of Troedel and his co-Defendant David Lee Hawkins ("Hawkins"), Mr. Riley conducted a neutron activation test on swabs bearing gunpowder residue from the hands of both Troedel and Hawkins. In his written report, he concluded that the specimens from the hands of Troedel and Hawkins contained antimony and barium in amounts typically found on the hands of a person who has discharged a firearm or has had his hands in close proximity to a discharging firearm. At Hawkins' trial, which was held prior to Troedel's trial, Mr. Riley testified that, in his opinion, "both of these individuals, Troedel and Hawkins, either discharged a firearm, or were in close proximity to a discharging firearm." On redirect examination, in response to the prosecutor's question, Mr. Riley again concluded that the amounts of antimony and barium on the hands of Hawkins were consistent with an individual who could have fired the weapon. Nonetheless, at Troedel's trial, Mr. Riley testified that, based upon the test analysis coupled with his education, training and experience, in his opinion, Troedel had fired the murder weapon. He further opined that Hawkins could merely have had his hands contaminated by being close to the murder weapon or in the same room. On redirect examination, Mr. Riley reit-

erated his opinion that Troedel had fired the murder weapon.

At the evidentiary hearing held before this Court on March 26, 1986, the parties stipulated to the introduction of deposition testimony of Mr. Riley taken on March 24, 1986, pursuant to the Court's discovery order. In his deposition, Mr. Riley testified that he could not, from the results of his tests, determine or say to a scientific certainty who had fired the murder weapon. He further testified that the differences in the amount of barium and antimony on the hands of Troedel and Hawkins were basically insignificant. In addition, the parties stipulated to the introduction of the deposition testimony of Lucien C. Haag, a criminalist and expert in the field of firearms and neutron activation analysis. He testified that, as a result of specifically enumerated variables applicable to the facts of this case, it could not be determined to a scientific certainty who had fired the murder weapon. Indeed, Mr. Riley even stated in his deposition that it is possible for a shooter not to have any gunpowder residue on his hands, yet for a nearby nonshooter to have such residue on his hands.

In light of the foregoing, the Court finds the opinion that Troedel had fired the murder weapon was not based upon a scientific certainty and, therefore, at the very least, was misleading.

B. *Knowing Use by the Prosecution*

Proper disposition of this question necessitates that the Court initially scrutinize what transpired at Hawkins' trial, which took place prior to the trial of Troedel. First, as previously mentioned, Mr. Riley rendered an opinion at the Hawkins trial that either Hawkins or Troedel had fired the murder weapon or had been within close proximity to a discharging firearm. Second, the prosecutors, who were attempting to establish that Hawkins had committed premeditated murder, called as a witness Michael Tillman, who testified that, on the evening of the murders, Hawkins had asked him whether he had a gun and had told him that he (Hawkins) wanted "to go out to Golden Gate and blow two dudes away because ... they owed him some

money." On redirect, the prosecution took great pains to emphasize to the jury that Mr. Tillman bore no "ill will" toward Hawkins and had come to court simply because he was subpoenaed to appear. At the conclusion of the trial, the jury found Hawkins guilty of felony murder and recommended a life sentence.

Approximately two months later, Troedel's trial commenced, and the same prosecutors who had represented the State at Hawkins' trial again were seeking to obtain a conviction for premeditated murder. Thus, while Michael Tillman was called as a prosecution witness and testified exactly as he had previously, the prosecutors in closing argument distanced themselves from him, in sharp contrast to their conduct at the Hawkins trial. Next, as Mr. Riley candidly admitted in his deposition, he was "pushed" further in his analysis at Troedel's trial than at Hawkins' trial. Furthermore, at the March 26th evidentiary hearing held before this Court, one of the prosecutors testified that, at Troedel's trial, after Mr. Riley had rendered his opinion which was contained in his written report, the prosecutor *pushed* to "see if more could have been gotten out of this witness." When questioned why, in the Hawkins trial, he did not use Mr. Riley's opinion that Troedel had fired the weapon, the prosecutor responded he did not know why. The prosecutor further testified that he first became aware of the differences in the amount of barium and antimony on the hands of the Defendants during cross-examination of Mr. Riley at the Hawkins trial. Nevertheless, the record reflects that the prosecutor did not pursue the matter at the Hawkins trial. Finally, the prosecutor at the evidentiary hearing admitted that in eliciting the opinion from Mr. Riley that Troedel had fired the weapon, he did *not* frame his questions in terms of a scientific *certainty* or even a scientific *probability*.

In light of this admission, the above testimony received at the evidentiary hearing and the inconsistent positions taken by the prosecution at Hawkins' and Troedel's trials, respectively, the Court concludes that

the opinion Troedel had fired the weapon was known by the prosecution not to be based on the results of the neutron activation analysis tests, or on any scientific certainty or even probability. Thus, the subject testimony was not only misleading, but also was used by the State knowing it to be misleading.

### C. *Materiality*

The final issue for determination is whether the testimony was material to the guilt or innocence of Troedel. The standard for materiality is whether the false or misleading testimony could in any reasonable likelihood have affected the judgment of the jury. *U.S. v. Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108; *Brown v. Wainwright,* 785 F.2d at 1463; *Williams v. Griswald,* 743 F.2d at 1543.

Absent the expert opinion testimony, there was *no* evidence, either direct or circumstantial, from which the jury or the court could have found beyond and to the exclusion of a reasonable doubt that Troedel had fired the murder weapon. Therefore, the testimony was not only material, but also was crucial to the jury's finding Troedel guilty of premeditated murder. Furthermore, it was an equally crucial factor in the jury's recommendation by a vote of 7–5 that the death penalty be imposed. Likewise, the testimony played a highly significant role in the imposition of the sentence of death by the trial court. In short, there is no question as to the materiality of the subject testimony.

The Court, therefore, concludes that Troedel has prevailed in demonstrating that his trial was rendered fundamentally unfair by the State's use of misleading testimony.

### II.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Troedel argues that he was denied reasonably effective assistance of counsel in two primary respects. First, he alleges that his counsel failed to investigate and consult with experts concerning the testimony about the gunpowder residue analysis. Second, he contends that defense counsel failed to investigate fully his theory of the case regarding a motive on the part of Hawkins, as well as Hawkins' propensity and reputation for violence. This second aspect relates to both the guilt and penalty phases of the trial. For the reasons set forth below, the Court has determined that these two ineffective assistance claims have merit.

▪ In order to establish ineffective representation, Petitioner must prove that (a) counsel's performance was deficient, i.e., fell below an objective standard of reasonableness and (b) the deficient performance prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Riley v. Wainwright,* 778 F.2d 1544 (11th Cir.1985).

### A. *Performance*

The Supreme Court has enunciated that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. This requires Troedel to demonstrate that the specific acts and/or omissions on the part of defense counsel were "outside the wide range of professionally competent assistance" in light of all the circumstances. *Id.* at 690, 104 S.Ct. at 2066. Furthermore, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689, 104 S.Ct. at 2065–6 (citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

The defense theory consisted solely of the contention that Hawkins had planned and committed the murders and that Troedel had been intimidated and coerced by Hawkins. Similarly, at the penalty phase, the defense theory was that Petitioner was a follower who was dominated by Hawkins, the one who actually had discharged the murder weapon. Troedel's testimony at

the guilt phase of the trial was consistent with his theory of defense.

### 1. *Expert Testimony*

Considering Troedel's first claim of ineffective assistance, the Court notes that under the facts as developed in this case, a most crucial aspect of the trial was the question of who fired the gun which actually resulted in the death of the victims. Defense counsel testified, through deposition, that he knew pretrial this issue would be critical. Nevertheless, he neither deposed Mr. Riley, the State's expert witness, nor bothered to consult with an expert in the field prior to trial. It is apparent from his deposition testimony that defense counsel himself had no special knowledge in this field. He further admitted that Mr. Riley's opinion appeared correct, inasmuch as Troedel had more gunpowder residue on his hands than did Hawkins.

"A criminal defense attorney has a duty to investigate, but this duty is limited to reasonable investigation." *Thompson v. Wainwright,* 787 F.2d 1447, 1450 (11th Cir.1986). *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Although the scope of the required investigation depends upon the number of issues and their complexity, the strength of the government's case and the overall strategy of trial counsel, at a minimum, counsel has the duty to interview potential witnesses and to make an *independent* investigation of the facts and circumstances of the case. *Nealy v. Cabana,* 764 F.2d 1173, 1177 (5th Cir.1985); *Martin v. Maggio,* 711 F.2d 1273, 1280 (5th Cir.1983). Petitioner has presented, by way of deposition, expert testimony to the effect that the opinion of the State's expert was not accurate, and has shown that such expert testimony would have been helpful in cross-examining and/or rebutting the State's expert. In addition, defense counsel's citing expense as a reason for failing to consult another expert is invalid, as this was a court-appointed case. Viewing the issue of who actually perpetrated the murders, coupled with the limited theory of defense, leads this Court to the conclusion that the failure either to depose the State's expert witness or, more importantly, to consult with any other expert in the field, fell outside the scope of reasonably professional assistance. Moreover, it cannot be said that this failure constituted any kind of rational defense strategy.

### B. *Failure to Investigate Co-Defendant's Background*

With respect to the failure to investigate the background of Hawkins, this Court agrees that counsel's performance was insufficient in both the guilt and penalty phases of the trial.

Where, as in the instant capital case, "a defendant's life may well depend upon the extent and nature of his participation, the background of a co-defendant could be crucial." *Thompson v. Wainwright,* 787 F.2d at 1450. The theory of defense, which was equally pertinent to the guilt and penalty phases, was that Hawkins, who had dominated and coerced Troedel, was responsible for the murders. Defense counsel admitted that he conducted no investigation into Hawkins' background to seek out a motive or to ascertain whether he was a person of violent character. He further testified that his reason for declining to investigate was that he knew only that Hawkins had been in trouble as a result of his drug usage. At the March 26th evidentiary hearing, Troedel presented several witnesses who testified to Hawkins' violent conduct and motive for the killings. The failure to conduct a background investigation cannot be considered a sound trial strategy in light of Troedel's defense, which was to affix the sole blame for the killings on Hawkins. Compare *Thompson v. Wainwright, id.*

### C. *Prejudice*

Having concluded that counsel's performance was deficient, this Court must now determine whether such a performance was prejudicial. This requires Troedel to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

### 1. *Expert Testimony*

The expert testimony presented on behalf of Troedel reflects that the opinion of the State's expert witness that Troedel had fired the murder weapon was not based on the results of the tests conducted by the State's expert and, further, was not based upon a scientific certainty. Troedel's expert also enumerated specific variables, including the long lapse of time between the firing and taking of the gunpowder residue samples, which would affect the validity of the prosecution's expert testimony. As previously mentioned, the opinion that Troedel had discharged the murder weapon was the only evidence upon which the jury and judge could have concluded beyond a reasonable doubt that Troedel had committed the killings. The expert testimony with respect to the gunpowder residue was the crucial issue in the trial of this cause. In this connection, the Court is convinced there is a reasonable probability the jury would have found Troedel guilty, at most, of felony murder had defense counsel consulted with an expert in order to conduct effective cross-examination of the State's expert witness or to present rebuttal testimony.

### 2. *Failure to investigate co-defendant's background*

An investigation of Hawkins' background would have revealed not only Hawkins' propensity to engage in violent conduct, but also a possible motive on his part for the killings. There was no evidence of Hawkins' violent character or motive presented at the trial other than robbery and elimination of witnesses, which were argued by the State. At the evidentiary hearing, Troedel presented witnesses who were familiar with Hawkins' often violent and jealous conduct. Of particular interest was the testimony of Scott Gill, a former roommate of Hawkins, whom Hawkins had known for ten (10) years. Mr. Gill had witnessed numerous violent acts committed by Hawkins and testified that Hawkins was very jealous of his girlfriend at the time, Theresa Adams. Mr. Gill also testified to a conversation which took place one week prior to the murders in question, at which time Hawkins had asked Gill for a ride out to Golden Gate because he was out of gas. Gill further testified that during that conversation, Hawkins had stated that another man was "messing around" with his (Hawkins') girlfriend and that he wanted to go out there and take care of the man. Knowing Hawkins' reputation for violence, Gill refused.

Unquestionably, this testimony would have fostered the theory of defense, provided a motive on the part of Hawkins and corroborated Troedel's trial testimony. Again, the Court concludes that if the above testimony as to violence and motive had been presented at Troedel's trial, there is a reasonable probability that the results of the proceedings would have been different. The Court finds this conclusion particularly compelling with respect to the penalty phase, where the jury heard no evidence of Troedel's violent and jealous character and voted 7–5 to recommend the death penalty.

### D. *Remaining Ineffective Assistance Claim*

Troedel also urges that defense counsel was ineffective in failing to obtain a statement given to the police by Paula Ayers on October 4, 1981, and to introduce at trial her deposition, which was taken on November 23, 1981.

At the deposition of a police officer, Harold Young, Troedel's counsel was informed by the officer that a statement had been given by a witness to the Collier County Sheriff's Department. The officer related to counsel the contents of the statement, which were that on the day before the shooting, Hawkins had told Paula Ayers that his girlfriend, Theresa Adams, had "drained his bank account" and "was fooling around on him," and that "he had a gun, he knew who the guy was and he was going to blow his head off." Officer Young offered to furnish the name of the witness if counsel wished to "come downstairs" after the deposition. Nevertheless, counsel did not take the time to get the name of the witness from Officer Young or otherwise attempt to obtain the statement and, as a result, was not aware that Paula

Ayers was that witness. Subsequently, on November 23, 1981, Troedel's counsel attended the deposition of Paula Ayers, who had been subpoenaed by counsel for Hawkins. She testified that Hawkins had told her that his girlfriend "had drained his bank account money ... spent money on a guy ... he was really mad and he was going to kill the guy." Although Troedel's counsel did have the opportunity to question Paula Ayers, he did not pursue this particular matter with her any further. While Troedel's counsel did issue a subpoena for Paula Ayers to appear at trial, when she failed to do so, counsel did not offer to introduce her deposition into evidence at either the guilt or penalty phase of the trial.

In failing to obtain the police report, counsel's ability to examine Paula Ayers at her deposition was substantially hindered. Had counsel obtained the report, he would have been able to examine her in greater detail with respect to her conversation with Hawkins on the day before the shootings. In addition, her statements in the police report and at the deposition support the theory of the defense concerning Hawkins' motive and intent to kill. There was no tactical reason for counsel not to have made use of this evidence; further, there is a reasonable probability that its use would have affected the outcome of the trial. Thus, the Court finds counsel's representation to be have been ineffective in this respect as well.

### III.

### THE BRADY VIOLATIONS

It is settled beyond dispute that a prosecutor bears the constitutional duty to disclose to the defense evidence which is both favorable and material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This duty is predicated on the recognition that

1. Troedel additionally notes as error the failure to use or introduce records of Hawkins' prior arrests and divorce. Because Troedel acknowledges the State did not suppress these records, which are public documents, *see* Pet.'s Proposed

the prosecutor's role transcends that of an adversary: he "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal proceeding is not that it shall win a case, but that justice shall be done."

*United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 3380 n. 6, 87 L.Ed.2d 481 (1985). (citing *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)). After careful consideration of the parties' pleadings and arguments, the Court finds the prosecutor in this case suppressed two pieces of favorable, material evidence and, consequently, justice was not done.

### A. *The Suppressed Evidence*

■ Troedel argues that the State suppressed (1) evidence that Hawkins had beaten a fellow inmate while incarcerated, following Hawkins' conviction but prior to Troedel's trial; (2) a police report of an interview with a witness to whom Hawkins had confided a plan to kill someone who was involved with his girlfriend; and (3) a statement by the same girlfriend that Hawkins had mistreated and physically abused her.[1] As a prerequisite to finding that these amounted to *Brady* violations mandating reversal of Troedel's conviction or sentence, the following three-pronged test must be satisfied as to each:

1. The evidence was suppressed by the prosecution.
2. The suppressed evidence was favorable or exculpatory.
3. The evidence was material to guilt or punishment.

*Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–7; *United States v. Bent-Santana,* 774 F.2d 1545 (11th Cir.1985).

### 1. *Inmate beating*

■ Troedel challenges the State's failure to disclose evidence that on or about

Findings of Fact and Conclusions of Law at 34, they cannot be challenged as *Brady* violations, and are more appropriately considered as part of Troedel's ineffective assistance of counsel claim. *See* Section II, *supra.*

January 4, 1982—less than 1½ months before his trial began—Hawkins had beaten a fellow inmate by kicking him in the face and then threatening that he "better not snitch," to prevent the inmate from testifying at another unrelated trial.[2] The State contends the prosecutor did not know of the incident at the time of Troedel's trial and sentencing and, therefore, the material was not suppressed within the meaning of *Brady.*

The evidence reflects the State was aware of this information for a period of time prior to Hawkins' initial sentencing hearing on March 17, 1982. Whether that period extended as far back as Troedel's trial, which ended in late February, is problematic. Mr. Osteen, Hawkins' counsel, asked the inmate at Hawkins' March 31st sentencing when he had told the state attorney of the incident, saying, "Has it been a couple of weeks ago?" The victim responded, "Yes."[3] The State claims this response must mean the incident was not disclosed anytime prior to literally two weeks earlier. The open-ended nature of the question, however, suggests that, depending on the type of inflection used by Mr. Osteen, it may have meant to the inmate, "Has it been *at least* a couple of weeks ago?"

Furthermore, in requesting a continuance, on March 17th, of Hawkins' initial sentencing hearing, for the purpose of supplementing the presentence investigation report with information about the beating incident, the state attorney informed the judge of the following:

And, it was only as a matter of fact some time ago that we found out that that information [of the beating] was not contained in the presentence investigation.[4]

This statement suggests either that the State knew of the incident prior to February 9th, the date on which the presentence investigation was prepared, but failed to include a record of it in the report, or that

the State did not find out about the incident until after preparation of the report on February 9th. The State's representation to the court, albeit inaccurate,[5] that "this particular incident occurred after the presentence investigation was prepared,"[6] would seem to support the latter interpretation. In any event, it is clear that the State very possibly knew of the incident prior to the guilt and penalty phases of Troedel's trial, ending February 26, 1982, and certainly knew of the incident prior to March 17th, the date on which the judge actually passed sentence on Troedel. The Court, therefore, finds that the information was suppressed, at the very least, prior to Troedel's sentencing.

The Court further finds that this suppressed evidence was favorable. Throughout both the guilt and penalty phases, Troedel consistently asserted that Hawkins had committed the murders and had coerced Troedel's participation. Given the lack of independent corroboration of Troedel's claims, evidence of Hawkins' violent conduct may have been able to sway either the jury or the judge, who, under Florida law, retained the power to override the jury's recommendation and to refuse to impose the death penalty when he actually sentenced Troedel on March 17th. *See* Fla. Stat. § 921.141; *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 3158, 82 L.Ed.2d 340 (1984).

These same considerations support a conclusion that the suppressed evidence was material. The Supreme Court's most recent pronouncement on the definition of materiality was made in *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3384, as follows:

The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is

2. Pet.'s App. Vol. II, § L at 7–9.

3. Pet.'s App. Vol. II, § L at 13.

4. *Id.*

5. The inmate testified at Hawkins' sentencing on March 31 that the beating had taken place on approximately January 4, 1982. Pet.'s App. Vol. II, § L at 3.

6. Pet.'s App. Vol. II, § K at 13.

a probability sufficient to undermine confidence in the outcome.[7]

This Court finds there is a reasonable probability that had the evidence of Hawkins' in-jail beating been disclosed, the result of the imposition of sentence would have been different. This is particularly true in view of this Court's present invalidation of expert testimony introduced at the trial, stating that Troedel, in all probability, was the triggerman. *See* Section I, *supra*. Absent such expert testimony, evidence of Hawkins' violence would have had all the more impact. In rejecting Troedel's challenge of his death sentences, the Florida Supreme Court specifically noted the dearth of evidence to support Troedel's testimony that he was substantially dominated by Hawkins. *Troedel v. State*, 462 So.2d at 397. Evidence of Hawkins' beating and threats could have supplied just such corroborating information which the Supreme Court found otherwise lacking, particularly when viewed cumulatively with additional suppressed evidence of Hawkins' physical abuse of his girlfriend, Theresa Adams, as discussed in subsection 3 *infra*. *See Chaney v. Brown*, 730 F.2d 1334, 1356 (10th Cir.1984).

Indeed, the State's own introduction of this evidence at Hawkins' final sentencing hearing, following a continuance granted for the express purpose of including such evidence in the presentence investigation report, demonstrates the State itself believed it was of material significance.

### 2. *The police report*

Troedel next challenges the State's failure to disclose a police report of an interview by police detective Michael Ryan with Paula Ayers, an unavailable witness to whom Hawkins had revealed, on the day before the murders, his intent to kill some-

one because of the man's involvement with his girlfriend. Such evidence would have been both favorable and material to Troedel's defense, since it would have buttressed his allegation that Hawkins was the triggerman and dominating force, and would have provided support for ascribing to Hawkins both a motive—jealousy—and a prior plan to commit the killings. This Court cannot find, however, that the State suppressed the report.

It is true that defense counsel was never afforded the police report and, when he asked the state attorney for a copy, was inaccurately informed that the report had already been furnished to him.[8] However, Troedel's counsel was present at Hawkins' pretrial deposition of the witness, Paula Ayers, and questioned Ms. Ayers himself at that time. In addition, Officer Harold Young advised Petitioner's counsel at his deposition taken on October 21, 1981, that a member of the Collier County Sheriff's Department had taken a witness's statement which was not yet sent to the state attorney's office. Officer Young told counsel that Hawkins had confided in the witness that "he was having problems with his girlfriend, Theresa Adams, and he was going to blow someone away."[9] He further stated that although he did not know the name of the witness, "I would be more than happy to furnish it to you if you would come downstairs." *Id.* Although the report itself contained the far more significant information that Hawkins knew the man who was "fooling around" with his girlfriend, had a gun and, on the very day before the murders, stated he intended to kill him,[10] Troedel's counsel nevertheless was aware of the existence of the report and its general substance and could have pursued the matter as well as interviewed

---

7. Although the Court has in the past applied a sliding scale of materiality according to whether the defense had made a general, specific or no request at all for the evidence, *see United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), five Justices in *Bagley* concluded that the above definition is "sufficiently flexible" to accommodate all three situations. 105 S.Ct. at 3384, 3385 (plurality and concurring opinions). *See also United States v. Barragan*, slip op. no. 4274, 4278–9 (11th Cir. July 18, 1976).

Thus, the fact Troedel's counsel made a general, rather than a specific, request for favorable or exculpatory evidence would not change application of the above standard.

8. Pet.'s App. Vol. II, § N at 8.

9. Pet.'s App. Vol. I, § F at 26.

10. Pet.'s App. Vol. II, § O.

the witness at greater length, had he exercised reasonable diligence.

While Troedel has a viable claim for ineffective assistance of counsel on the basis of his attorney's failure to follow up on the evidence disclosed to him by Officer Young and Paula Ayers in her deposition, *see* Section II *supra,* his *Brady* claim must fail. *See, e.g., United States v. McMahon,* 715 F.2d 498, 501 (11th Cir.1983).

### 3. *Ex-girlfriend's statement*

An oral statement given to the prosecutor by Theresa Adams, former girlfriend of Hawkins, contains the information that Hawkins had mistreated and, in one specific instance, had forced or pushed her head against the floor. T.[11] at 50–53, 54. The prosecutor's admission that he did not disclose this statement to Troedel's counsel establishes conclusively that the State suppressed this information:

Q: Did you tell the defense attorney about Theresa Adams' oral statement to you?

A: No, because I did not consider it to be exculpatory or a matter of impeachment of any nature.

T. at 52. *See also* T. at 60.

While the state attorney may be correct in characterizing the evidence as neither exculpatory nor impeaching, it is apparent to this Court that such evidence would have been favorable and material to Troedel. Had this evidence been introduced at the guilt phase, it would have lent credibility to Troedel's assertion that Hawkins was the triggerman and had coerced Troedel's participation; had it been available at the penalty phase or sentencing, Troedel could have used it, in conjunction with evidence of Hawkins' beating of an inmate, *see* subsection 1, *supra,* to demonstrate he was acting under the substantial domination of Hawkins. More significantly, had Troedel been afforded this information, reasonably effective counsel could have tied it together with the information supplied to Detective

Ryan by Paula Ayers, as reflected in Detective Ryan's report, to build a theory of Hawkins' motive, intent and violent propensities. Because Troedel's trial and sentence occurred without the benefit of this evidence,[12] this Court's confidence in the outcome of the case has been undermined, and reversal is mandated.

### IV.

### INSUFFICIENCY OF THE EVIDENCE

■ Troedel further contends that the prosecution failed to present evidence upon which the trier of fact could have found beyond a reasonable doubt that he either killed, intended to kill or contemplated the taking of a life.

The death penalty cannot be imposed on a defendant who does not kill or attempt to kill or does not intend to participate in or facilitate a murder. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The only evidence upon which the jury could have found beyond a reasonable doubt that Troedel killed the victims was the opinion of the State's expert that Troedel had fired the murder weapon. Although this Court has determined that opinion to be misleading, as not based on scientific certainty or probability, there was sufficient remaining evidence upon which a reasonable trier of fact could have concluded that Troedel intended to participate in or facilitate a murder or, at the very minimum, intended the use of lethal force. Therefore, this point lacks merit.

### V.

### JURY SELECTION CLAIM

Troedel claims that four (4) prospective jurors were improperly excluded from serving on the jury because of their death penalty beliefs. The Court finds no merit in this contention. *See Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83

---

**11.** T. signifies the transcript of the evidentiary hearing held before the Court on March 26, 1986, regarding Troedel's request for habeas relief.

**12.** The suppression occurred in the face of defense counsel's unsuccessful efforts to locate Theresa Adams, efforts undertaken to substantiate Petitioner's claims and uncover a motive for the crime. *See* Grogan Deposition at 41–45.

L.Ed.2d 841 (1985); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

## VI.

### IMPROPER PROSECUTORIAL COMMENT

██ Troedel next challenges several remarks of the prosecutor as being improper. Primarily, it is argued that the prosecutor, during the voir dire examination and in closing argument, made statements which attempted to dilute the jury's sense of responsibility for a verdict of death. Relying upon *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), Troedel contends that these remarks constitute reversible error. This Court finds to the contrary. Unlike the prosecutorial remarks in *Caldwell,* the record reflects the prosecutor simply outlined the sentencing and review procedures in capital cases, which included the role of the jury in recommending a life or death sentence. *See California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). In addition, the record further reflects that the prosecutor in his closing argument emphasized to the jurors the significance of their role in the sentencing process and urged them not to abdicate their responsibility.

Troedel also complains of the following two remarks made by the prosecutor:

> [T]he citizens of Collier County are not going to be seated at my table, but you recognize that they are party to this particular action just as much as if they were sitting, every one of them were sitting here.
>
> He is just trying to blame it all on Hawkins. Now, there for a while when I was sitting there, *I thought I was in an echo chamber from a couple of months ago.* He is just taking the position, "Hey, you know, Hawkins, well, he did it all. He did it all, I didn't do anything. I was just a victim of circumstances."

To warrant habeas corpus relief, Troedel must demonstrate (1) that prosecutorial arguments encouraged the jury to take into account matters that are not legitimate considerations and (2) that the arguments were so prejudicial that they rendered the proceedings fundamentally unfair. *Johnson v. Wainwright,* 778 F.2d 623 (11th Cir.1985); *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985); *Tucker v. Kemp,* 762 F.2d 1480 (11th Cir.1985). Assuming *arguendo* that these comments were improper, this Court cannot find that viewed in the context of the entire proceeding, they rendered the trial fundamentally unfair, i.e., that there was a reasonable probability that the remarks changed the outcome of the case. Moreover, the Court cannot conclude that the comments had any effect on the guilt or sentencing decision rendered by the jury. *See Caldwell v. Mississippi,* 472 U.S. at 341, 105 S.Ct. at 2646. Thus, Troedel has failed to demonstrate any reversible error on this ground.

## VII.

### IMPUTED INTENT AS A BASIS FOR THE FINDING OF PREMEDITATED MURDER AND RESULTING DEATH SENTENCES

Troedel suggests that through the prosecutor's questions to prospective jurors and his remarks in closing argument, the jury was permitted to find him guilty of premeditated murder by imputing to him the acts of Hawkins (under an aiding and abetting theory). The record reflects that the trial court correctly and adequately instructed the jury on the requisite elements of premeditated murder and felony murder. Moreover, the aiding and abetting theory was explained as a component only of felony murder. The jury returned a verdict of premeditated murder, which required Troedel himself to have the requisite intent to kill. Thus, this Court rejects the suggestion that there is a substantial reason to conclude that the jury believed Troedel's version of the events, but found him guilty because they imputed the acts of Hawkins to him.

## VIII.

### CONFLICT OF INTEREST

██ Troedel argues that he was deprived of a fair trial as a result of the

initial representation of himself and Hawkins by Mr. Tom Osteen, an Assistant Public Defender. For approximately one month, Mr. Osteen represented Troedel and Hawkins until a severance was granted on the grounds that the respective defenses were antagonistic and conflicting.

The threshold question is whether there was an actual conflict of interest. "An actual conflict exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant *whom the same counsel is representing.*" *Baty v. Balkcom,* 661 F.2d 391, 395 (5th Cir. Unit B 1981) (emphasis added).

There is no evidence in this case to establish that Mr. Osteen was subject to divided loyalties sufficient to establish an actual conflict of interest. Upon the granting of the motion for severance early in the proceedings, independent counsel, Tom Grogan, was appointed to represent Troedel and conduct his own investigation. Troedel has failed to demonstrate that his counsel, Mr. Grogan, was forced to make choices that would benefit Hawkins at Troedel's expense. Neither has Troedel shown that during the brief period that Mr. Osteen represented him and Hawkins that Osteen pursued any course of action helpful to Hawkins and harmful to Troedel. Moreover, Troedel points to no different defense strategy which could have been employed by his attorney if, as suggested by Troedel, Mr. Osteen had withdrawn from representation of Hawkins after the severance was granted. Thus, the Court finds that Troedel has failed to demonstrate any adverse effect in his case. Any allegations with respect thereto amount to nothing more than mere speculation. Compare *Stevenson v. Newsome,* 774 F.2d 1558 (11th Cir. 1985); *Burger v. Kemp,* 753 F.2d 930 (11th Cir.1985).

## IX.

### CONCLUSION

Accordingly, based upon the reasons and authorities set forth above, it is

ORDERED AND ADJUDGED that the writ of habeas corpus is GRANTED and the judgments of conviction and sentences are hereby VACATED.

It is further

ORDERED AND ADJUDGED that within ninety (90) days of the date hereof, Troedel shall be granted a new trial.