462 So.2d 392 (1984)
David Walter TROEDEL, Appellant,
v.
STATE of Florida, Appellee.
No. 61957.
Supreme Court of Florida.
December 6, 1984.
Rehearing Denied February 18, 1985.
*394 Daniel R. Monaco of Monaco, Cardillo, Keith & Volpe, Naples, for appellant.
Jim Smith, Atty. Gen. and Peggy A. Quince, Asst. Atty. Gen., Tampa, for appellee.
BOYD, Chief Justice.
This case is before the Court on appeal from a judgment of conviction of crimes including two capital offenses for which sentences of death were imposed. We have jurisdiction of the appeal. Art. V, § 3(b)(1), Fla. Const.
Appellant was charged with the robbery and murder of Chris Musick and Robert Schreckengost and with the burglary of their home. The victims had been shot some time during the early morning hours of June 12, 1981. Appellant was arrested near the victims' home shortly after they had been shot. The evidence presented against appellant at trial was overwhelming.
At the trial Jim Decker, a state attorney's investigator, testified that after midnight on the night of June 11, 1981, he observed on the road in front of his neighbor's residence a truck which he did not recognize. Because the area is sparsely populated and the road little used except by residents, his curiosity was aroused and he proceeded to go and take a closer look at the truck. Not seeing anyone around, he nevertheless returned home and telephoned the sheriff. A sheriff's deputy was dispatched to the area. Decker and the deputy then went to investigate and found appellant and David Hawkins standing beside the truck.
The sheriff's deputy testified that on the seat in the cab of the truck he saw a .25 caliber pistol and a .22 caliber automatic pistol. Appellant claimed ownership of the .25 caliber while Hawkins said he had borrowed the automatic. While the deputy talked to the two men, Decker went to the house and discovered that the front door was ajar. He reported this to the deputy who then warned the two suspects of their rights not to answer questions and conducted a "pat-down" search. In Hawkin's front pocket he found some coins and some foreign paper currency.
Investigator Decker then entered his neighbor's house and discovered the two victims. Both had been shot. A bedroom had been ransacked. Musick was dead but Schreckengost was still breathing. Decker called for emergency medical assistance but Schreckengost soon died.
Appellant and Hawkins were taken into custody. At the Collier County jail, sheriff's deputy Lt. Jack Gant conducted the first step of a chemical test to detect the presence of barium and antimony on the suspects' hands. He testified that he rubbed both hands of both men with cotton swabs treated with a five-percent solution of nitric acid, using a separate cotton swab for each hand. Each cotton swab was separately packaged in plastic. A separate swab treated with the solution only was also separately packaged for use as a control sample in the chemical analysis. These samples were sent to an F.B.I. crime laboratory to be examined for the presence of the gunshot residues.
A chemist who tested the samples was qualified as an expert in the analysis of chemical elements. He testified that the neutron activation test can detect and measure small amounts of barium and antimony, two elements widely used in the manufacture of ammunition. Trace amounts of the elements escape from the chamber of a firearm when discharged and may be deposited on the hands of the person firing the weapon. The chemist testified that barium and antimony are present in all commercially available ammunition except for .22 caliber ammunition. The expert testified that large amounts of barium and antimony were found in the material taken from both appellant's and Hawkins' hands.
The chemical expert also conducted a test firing of appellant's.25 caliber pistol and found that upon discharge it deposited large amounts of both barium and antimony. Twenty-two caliber ammunition, the *395 expert said, emits less traceable amounts, if any, of these elements. His comparison of the residue samples taken from the hands of the two defendants revealed that there was twenty-five to thirty percent more barium and four hundred percent more antimony on appellant's hands than on Hawkins'. The expert therefore concluded and offered the opinion that appellant had fired the .25 caliber pistol while Hawkins was nearby.
A forensic pathologist testified that he performed the autopsies and that both victims died from gunshot wounds to the head. He testified that Schreckengost was shot twice in the head, once in each thigh and once in a finger, this last being characteristic of a defense wound according to the pathologist. There was a penny found in the posterior nasal pharynx of victim Schreckengost which the expert said was probably swallowed and then drawn up through the throat. The pathologist also testified that Musick was shot twice in the head, and offered the opinion that he was alive when shot the second time.
A firearms examiner testified that bullets recovered from the heads of both victims were conclusively determined to have been fired from appellant's .25 caliber pistol. Another witness testified that he had sold the pistol to appellant a few weeks before the murders.
There was detailed testimony by a detective about the crime scene and expert testimony about various items of evidence found there. In a bedroom adjacent to the bathroom where the bodies were found there was a pillow with a large black hole on one side and three small holes on the other. An expert testified that the holes were caused by shots from a gun held directly against the pillow. The purpose of using the pillow in this manner, in the expert's opinion, was to muffle the sound. Feathers from inside the pillow were scattered around the room. A feather was found in the barrel of appellant's pistol which was similar in composition, according to a fiber expert's testimony, to the feathers in the pillow. Four .25 caliber bullet casings found on the bathroom floor had markings that were consistent with the firing characteristics of appellant's pistol.
In addition to the two firearms that appellant and Hawkins admitted were in their possession, a third pistol was also found in the truck. A .22 caliber revolver, it was examined for fingerprints and was found to bear one of appellant. In a wooded area near the victims' house, police found a pillowcase containing two rifles, a shotgun, some jewelry, and a knife in a case bearing the initials, "D.T." A package of Playtexbrand rubber gloves were found under the truck.
Eric Schreckengost testified that he owned and lived in the house where the murders took place and that the victims were his son Robert and his stepson Chris. He identified the rifles, the shotgun, and the .22 caliber revolver found in the truck as his own. He said that some of the coins found in Hawkins' pocket were like the coins missing from his home. His wife identified the jewelry and said that the rubber gloves were not hers.
The state presented the testimony of a witness who said that during the evening of June 11, 1981, he went to a lounge with appellant and Hawkins. The witness said that Hawkins asked him and appellant whether they had guns. Appellant replied that he did have one. The witness told Hawkins that he had a shotgun but Hawkins said that would be too loud. According to the witness, Hawkins said there were "two dudes" that he wanted to "blow away."
Appellant testified in his own behalf. He admitted being at the lounge with Hawkins and the last-mentioned witness, but denied hearing Hawkins say anything about guns or "blowing away" anyone. Appellant said that Hawkins was to give him a ride home but stopped at the Schreckengost home saying he needed to talk to someone. While they were in the house, according to appellant, Hawkins drew his gun and robbed and then shot the two victims. Appellant testified that he did not try to interfere because of concern for his own safety. *396 For the same reason he carried certain items out of the house when Hawkins told him to.
The jury found appellant guilty of two counts of first-degree murder, robbery while armed, burglary while armed, and burglary during which an assault was committed.
At the penalty phase of the trial, the state presented no further evidence. The defense presented the testimony of appellant's mother, stepfather, sister-in-law, and a friend. They testified that appellant was quiet, passive, and a person of good character and behavior. The recommendation of the jury was that appellant be sentenced to death for each of the murders.
Appellant challenges his convictions on the ground that the trial court erred in admitting into evidence the results of the neutron activation tests. He argues that the test results should have been excluded as unreliable because the officer who took the residue samples from his hands used a solution he mixed himself rather than the pre-mixed solution provided in a neutron activation test kit routinely used in law enforcement. The detective testified that he used a solution of five percent nitric acid. There was no evidence showing whether this was the same as or different from the solution available in the test kit.
The state responds that appellant did not object at trial to the admission of the evidence in question and therefore may not obtain appellate relief on the issue now. We agree. See, e.g., Castor v. State, 365 So.2d 701 (Fla. 1978); Clark v. State, 363 So.2d 331 (Fla. 1978). If appellant had objected to the evidence on the ground he now relies upon, the trial court could have made a determination of whether there was an adequate reason for excluding the evidence. The court could have inquired into the question of whether the precise quality or substance of the solution used should be a matter of predicate to the admissibility of the test by reason of its effect on the test's reliability. Because appellant did not raise this issue below, the trial court did not have an opportunity to evaluate and rule on this question. An appellate court is in a weak position to rule on the legal issue of admissibility of scientific evidence when, because of the lack of an objection or motion below, there is no unfolding of the factual basis upon which the legal question turns.
Moreover, appellant has not presented any sufficient reason why the chemical analysis should not have been admitted into evidence. He does not challenge the scientific basis for the neutron activation test. The validity and reliability of the tests are widely recognized among scientists and the evidence derived from them are therefore generally accepted as evidence in the courts. Annot., 1 A.L.R. 4th 1072 (1980). Appellant's challenge is to the method in which the test was administered. However, as was stated above, appellant does not tell us why the test as administered by the detective who testified should be considered inferior in reliability to a test administered using the commercially prepared swab solution available in neutron activation test kits. The chemist who analyzed the samples taken from appellant's hands apparently found that the detective's collection procedures had been adequate. We see the appellant's objection as pertaining to the weight and credibility of the evidence rather than to its admissibility. Any perceived weaknesses in the testimony of the expert and the detective could have been brought out through cross examination. See State v. Major, 564 S.W.2d 79 (Mo. Ct. App. 1978); State v. Montgomery, 545 S.W.2d 655 (Mo. Ct. App. 1976). We therefore find that the admission of the evidence based on the neutron activation test was not error.
After hearing appellant's presentation at the penalty phase and receiving the recommendation of the jury for two death sentences, the judge issued his findings of fact in support of a sentence of death. The trial judge found that "the capital felony" was committed during the commission of robbery and burglary; was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from *397 custody; was committed for pecuniary gain; was especially heinous, atrocious, or cruel; and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
In his sentencing findings, the judge specifically discussed each of the statutory mitigating circumstances in light of the evidence and found none of them to be applicable. The written findings also show that the defendant's evidence relating to any nonstatutory mitigating factors was given consideration and was found to be without any compelling weight.
Appellant argues that the trial judge erred in finding that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification under section 921.141(5)(i), Florida Statutes (1981). In support of this finding the judge cited evidence showing that appellant was "the `trigger man' in this `execution-style' murder." The evidence was clearly sufficient to show that appellant wielded one of the murder weapons and that he shared in the premeditated intent to kill the two victims according to a pre-arranged plan. In Combs v. State, 403 So.2d 418, 421 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982), this Court said that section 921.141(5), paragraph (i) "in effect adds nothing new to the elements of the crimes for which appellant stands convicted but rather adds limitations to those elements for use in aggravation, limitations which inure to the benefit of a defendant." Here it was permissible for the court to find that the murders were not only premeditated but also "cold, calculated and ... without any pretense of moral or legal justification." See 403 So.2d at 421.
Appellant argues that the trial judge erred in failing to find the mitigating factor that appellant acted under the substantial domination of Hawkins. § 921.141(6)(e), Fla. Stat. (1981). The only evidence of this was appellant's own account of the crimes which neither the jury nor the judge believed. There is therefore no basis for us to reverse the death sentence on the ground of evidence of this mitigating factor.
We note that the accomplice Hawkins was also prosecuted for his role in the crimes and was convicted of robbery, burglary, and two counts of first-degree murder. Along with appellant Hawkins was sentenced to death for each of the murders. On appeal, this Court vacated the death sentences given to Hawkins and ordered that sentences of life imprisonment be imposed. Hawkins v. State, 436 So.2d 44 (Fla. 1983). The opinion of the Court pointed out that the jury found Hawkins guilty of felony murders rather than premeditated murders, had evidence before it showing a lesser degree of participation and culpability on the part of Hawkins, and recommended a life sentence for him. Id. at 47. Thus the evidence pertaining to the respective roles of the two offenders supports sentences of life imprisonment for Hawkins and sentences of death for appellant. See, e.g., Witt v. State, 342 So.2d 497 (Fla.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977).
Appellant makes no further specific challenges to the sentencing findings but argues generally that the court erred in sentencing him to death because of improper weighing of the aggravating and mitigating circumstances. We will therefore consider each of the remaining aggravating circumstances.
The trial judge noted in his findings that under Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977), the circumstances that the murders were committed in the course of a robbery and that they were committed for pecuniary gain both related to the same essential feature of the murders and therefore constituted but one statutory aggravating circumstance.
Regarding the finding that the "capital felony" was especially heinous, atrocious, or cruel, the trial judge in his written findings cited only evidence concerning the murder of Schreckengost. He found that the bullet wounds in Schreckengost's legs, *398 together with other medical evidence, indicated that the victim was deliberately tormented before being killed. There are no similar findings based on evidence pertaining to the murder of Musick. However, there was testimony that Musick survived the first gunshot wound to his head and was living when shot the second time. Moreover, the fact that the victims were killed in their home sets the crime apart from the norm. Breedlove v. State, 413 So.2d 1 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). We therefore approve the finding as to both murders.
Regarding the aggravating circumstance of commission for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, the trial judge found as follows: "The victims of the robbery were plainly shot to death to eliminate all the witnesses to the crimes. This was clearly for the purpose of allowing the defendant to avoid detection and thereby prevent his arrest for these crimes." In Riley v. State, 366 So.2d 19 (Fla. 1978), this Court said that when the victim is not a law enforcement officer (i.e., one having the authority and present ability to make an arrest), "[p]roof of the requisite intent to avoid arrest must be very strong." 366 So.2d at 22. The testimony that appellant and Hawkins had discussed going to the victims' home for the specific purpose of killing them would seem to indicate that the primary purpose of the defendants' action was not burglary and robbery but murder. This aggravating circumstance most clearly applies when the offender's primary purpose is some antecedent crime such as burglary, theft, robbery, sexual battery, etc., for which the criminal then kills in order to avoid arrest and prosecution. If a defendant is shown to have killed a victim out of personal animosity and then decides as an afterthought to take the victim's wallet, then the killing was done primarily to see the victim dead and not to avoid being arrested for robbery. In the present case there is some question whether there was proof beyond a reasonable doubt that the initial purpose of going to the victims' house was to unlawfully enter and rob the victims and that the killers had the ancillary purpose, in murdering the victims, of avoiding arrest or effecting escape. Such a conclusion is an inference that might reasonably be drawn but is not the only reasonable inference. In the factual situation presented by this case, the aggravating circumstance in question would be clearly shown if the appellant had killed the investigator or the deputy who came upon the scene to investigate. So far as the evidence showed, however, the primary purpose of appellant's going to the Schreckengost home was to commit murder. See Menendez v. State, 419 So.2d 312 (Fla. 1982); Menendez v. State, 368 So.2d 1278 (Fla. 1979). We therefore disapprove the trial court's finding of this aggravating circumstance.
Appellant argues that the sentences of death imposed upon him constitute cruel and unusual punishment, in violation of the eighth and fourteenth amendments to the United States Constitution, under the rule established by the United States Supreme Court in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In that case, the Court reversed the sentences of death imposed under the felony-murder statute on a defendant who aided and abetted the underlying felony but was not present at the immediate scene of the killings. The Court held that the eighth amendment prohibits capital punishment in such a situation in the absence of actual proof that the felony accomplice intended or contemplated that life would be taken in the course of the felony. The present case is vastly distinguishable not only because appellant was present at the immediate scene of the murders, but also because the evidence showed that he wielded one of the murder weapons and shot both victims. His liability for the murders, unlike Enmund's, rests not on the felony-murder doctrine but on evidence showing a premeditated design to effect the deaths of the two victims.
*399 Appellant's challenges to his convictions and sentences do not include the argument that he was improperly convicted of two separate counts of burglary when there was in fact only one commission of this statutory offense. However, we reach the issue anyway because we believe that a conviction imposed upon a crime totally unsupported by evidence constitutes fundamental error. The trial judge imposed no sentence on count five, the second burglary count, because he found it to be "the same charge" as count four, the first burglary count. Count four charged burglary during which an assault was committed. Count five charged burglary while armed. Committing an assault during a burglary and being armed during a burglary are two grounds upon which a charge of burglary can be enhanced in seriousness under section 810.02, Florida Statutes (1981). However, neither the allegation nor the proof of both enhancement factors can transform one instance of unlawful entry from one crime into two crimes. There was no evidence of more than one such unlawful entry. The court should have merged counts four and five not only for sentencing purposes but also for purposes of rendering a single judgment of conviction.
We have approved the trial court's findings that the murders were committed in the course of committing burglary and robbery; that they were especially heinous, atrocious, or cruel; and that they were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Our disapproval of the trial court's finding that the murders were committed for the purpose of avoiding arrest does not call into question the legal appropriateness of the sentences of death. There were several aggravating circumstances properly shown; the jury recommended sentences of death; there were no mitigating circumstances. See Waterhouse v. State, 429 So.2d 301 (Fla.), cert. denied, ___ U.S. ___, 104 S.Ct. 415, 78 L.Ed.2d 352 (1983). The sentences of death are proper.
The judgments of conviction of two counts of murder in the first degree, one count of robbery while armed, and one count of burglary with an assault are affirmed. The judgment of conviction rendered upon the jury's verdict of guilt on count five of the indictment  burglary while armed  is reversed. The sentences of death are affirmed.
It is so ordered.
ADKINS, OVERTON, ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.