579 So.2d 86 (1991)
Richard Earl SHERE, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 74352.
Supreme Court of Florida.
April 4, 1991.
Rehearing Denied June 4, 1991.
*88 Edward L. Scott and Don Gleason of Edward L. Scott, P.A., Ocala, for appellant.
Robert A. Butterworth, Atty. Gen. and Belle B. Turner, Asst. Atty. Gen., Daytona Beach, for appellee.
BARKETT, Justice.
Richard Earl Shere, Jr., appeals his conviction of first-degree murder and sentence of death. We affirm.[1]
The victim, Drew Snyder, was reported missing in December 1987, and the ensuing investigation led to Shere, whom police contacted three weeks after Snyder's disappearance. Shere waived his Miranda[2] rights, made a series of statements, and led detectives to various scenes involved in the murder.[3]
According to those statements, Shere said Bruce "Brewster" Demo told him on December 24 that Snyder was going to inform the police about Demo's and Snyder's theft of some air conditioners. Demo also advised Shere that Snyder was a "big mouth" who "had ratted out" on Shere as well. Shortly after midnight on the morning of December 25, Shere received a telephone call from Demo advising him that Demo was thinking about killing Snyder, and Demo threatened to kill Shere if he did not help. Shere then went to Demo's house where Demo loaded a shovel into Shere's car. They smoked marijuana, drank beer, went to Snyder's house at about 2:30-3:00 a.m., and talked Snyder into going rabbit hunting.
At some point during the hunt in the early morning hours, Shere placed his .22-caliber pump action rifle on the roof of the car so he could relieve himself. Suddenly, Shere said, Demo grabbed the rifle, and Shere heard the weapon discharge. Shere dropped to the ground and heard Snyder say, "Oh, my God, Brewster," followed by several more shots. When the shooting stopped, Shere got up and saw Snyder, still breathing, lying on the back seat of the car. Shere said he wanted to take Snyder to the hospital, but Demo took out his own gun, a .22-caliber pistol, and shot Snyder in the forehead, pulled him out of the car, and shot Snyder again in the chest. After the last shot was fired, they loaded Snyder's body into the trunk and drove to a nearby location where Shere said Demo made him dig a hole and bury the body. Then Shere took Demo home, drove to his own house, cleaned up, and burned the bloodied back seat of his car in the back yard.
At Demo's suggestion, Shere said, he and his girlfriend, Heidi Greulich,[4] went to Snyder's house later that day, gathered some of Snyder's belongings, then drove to Clearwater to dump the belongings, hoping to leave the impression that Snyder had suddenly left town. Shere also said he traded the .22-caliber rifle after the murder. Detectives recovered the rifle and Shere identified it as one of the weapons used to shoot Snyder.
Contradicting Shere's account, Demo made a statement to detectives in which he accused Shere of firing the first shots. Detective *89 Alan Arick testified in the defendant's case without objection that Demo said he turned his back to the car to relieve himself when he heard a shot. He turned and saw Shere pointing the rifle at Snyder, then Shere fired at Snyder five or six times through the car's window. Demo said Shere pointed the gun at him and told him to finish off Snyder, Arick testified. Demo said he fired the pistol two times into Snyder's head and one time to the heart, including "the fatal shot." Demo told Arick he made Shere dig the grave because he was upset by what Shere had done to Snyder.
Greulich testified as a court witness about a statement she made to detectives in January 1988. In her statement she told detectives that she overheard Shere's end of the telephone conversation with Demo in the early hours of December 25. Shere reportedly said to Demo "I can't believe Drew would turn state's evidence against me." When Shere returned home on the morning of December 25, Greulich told detectives, she saw blood on Shere's jeans and on the back seat of Shere's car. Greulich testified that Shere told her he alone killed Snyder, but he said that only to protect her, because "[i]f I knew Brewster was out there, Brewster would have hurt me."
Shere's friend, Ray Pruden, testified that one night after Christmas Shere told him he shot Snyder to death while out rabbit hunting. He said he shot him ten or fifteen times, then buried the body. Shere did not say that Demo was involved, Pruden testified.
Medical testimony established that Snyder was shot to death with ten gunshots. Three shots were fired into his head, one shot was fired through the chest, and other shots were fired into the back, the buttocks, the right thigh, and the right forearm. Death could have been caused by gunshot wounds to the head or chest. The medical examiner testified that any of the shots could have caused pain had Snyder been conscious, but there was no evidence that Snyder was conscious.
Seven projectiles were removed from the body during the autopsy. Ballistics evidence showed that shots fired into Snyder's head came from the pistol, one bullet recovered from Snyder's leg was fired from the rifle, and others could not be clearly identified. Other forensic evidence established that shots had been fired in Shere's car, that human blood was found on Shere's boots, and that a hair from Snyder was found on Shere's jacket.
The jury found Shere guilty and recommended the sentence of death by a vote of seven to five. In its written findings to support the death sentence, the trial court found three aggravating circumstances: 1) the murder was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws by eliminating a witness;[5] 2) the murder was especially evil, wicked, atrocious, or cruel;[6] and 3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[7] In mitigation, the court wrote that it considered numerous possible mitigating circumstances, rejected some, and found that "the aggravating circumstances far outweighed the mitigating circumstances."
Shere raises eleven issues.[8] We begin with issues related to the testimony presented at trial.
First, Shere claims that the trial court erred in denying his motion for mistrial because the state implied that Shere was facing other, unrelated criminal charges. Before trial, the court granted Shere's motion to bar the state from presenting evidence that detectives first contacted Shere at a courthouse where Shere appeared on other criminal charges. *90 Despite that order, the prosecutor adduced testimony from Detective Arick that he located Shere "at the courthouse." However, the jury heard nothing to suggest that Shere's presence "at the courthouse" related to any other criminal charges against him. Shere objected and moved for a mistrial. The trial court sustained the objection but denied the motion for a mistrial. We conclude that although the prosecutor's endeavor to elicit that testimony despite the court's prior order may be questionable, there was no abuse of discretion by the trial court under these circumstances.
Shere next argues that the trial court erred in denying the motion to suppress his statements to detectives. The record shows that detectives first approached Shere on January 13, 1988. They took him to the sheriff's office where he waived his Miranda rights, made no inculpatory admissions, and invoked his right to silence. Detectives immediately ceased the interrogation and incarcerated Shere. The next day, detectives advised Shere that Demo had implicated him in Snyder's murder. Shere again waived his Miranda rights in accord with Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), this time inculpating himself in a detailed series of statements about the killing. Shere argues that his inculpatory statements were not voluntary when considered in the totality of the circumstances. Specifically Shere makes reference to the fact he previously had invoked his right to silence; that detectives advised him it would be better to cooperate, and that it would be bad or irreversible if he did not; that he made the statements without benefit of counsel; that he had not been taken before a judge; that the second interrogation took place in jail; and that he had been told by a law enforcement officer that Demo implicated Shere as the murderer.
We find no evidence in the record to support Shere's claim that either any single act by detectives, or the totality of the circumstances, compelled him to make involuntary statements in violation of his fifth amendment rights. The trial court found that Shere had been advised of his rights and waived them in accordance with Miranda and Mosley. We find no abuse of discretion.
In Shere's final evidentiary claim, he contends that the trial court erred by calling Greulich to testify as a court witness pursuant to section 90.615(1) of the Florida Statutes (1987).[9] We agree that the trial court abused its discretion, thereby permitting the state to introduce inadmissible evidence through improper cross-examination and impeachment. However, under the circumstances of this case, we find the error to be harmless. The evidence against Shere came largely from his own mouth, including his self-incriminating statements and the physical evidence which those statements helped to identify. The jury viewed evidence of the crime scene that was produced directly because of Shere's cooperation with investigators. Demo's statement and Pruden's testimony were very damaging. Moreover, portions of Greulich's incriminating testimony would have been admissible anyway had the error not been committed. Thus, the quality and quantum of incriminating evidence properly admitted at trial compel us to conclude beyond a reasonable doubt that there is no reasonable possibility that erroneously calling Greulich as a court witness and admitting her prior statement contributed to the verdict. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Nonetheless, we address the court witness rule issue presented here to clarify it in light of apparent confusion as to its use, which has come to our attention in recent years.
As a general rule, the purpose of cross-examination is to elicit testimony favorable to the cross-examining party, to challenge evidence adduced from the witness by other parties, and to challenge the witness's credibility when appropriate. Contrary to the form generally used in *91 direct examination, counsel on cross-examination is authorized to lead and impeach a witness. §§ 90.608, 90.612, Fla. Stat. (1987).[10]
Florida law has long followed the general rule that parties may not cross-examine and impeach their own witnesses. § 90.608, Fla. Stat.[11] "This rule resulted from a belief that the party who calls a witness to testify vouches to the court and jury for the credibility of that witness."[12] C. Ehrhardt, Florida Evidence § 608.2, at 298 (2d ed. 1984). A narrow exception evolved for the cross-examination and impeachment of "adverse" witnesses. § 90.608(2), Fla. Stat. Generally, an adverse witness is a person called by a party in the good faith belief that the witness is credible and will give favorable testimony, but the witness makes an affirmatively harmful or prejudicial statement against the calling party on direct examination. See, e.g., Jackson v. State, 451 So.2d 458, 463 (Fla. 1984) (witness was not adverse, and thus could not be impeached on direct examination, because the testimony was not affirmatively harmful), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988); Dudley v. State, 545 So.2d 857, 860 (Fla. 1989) (Grimes, J., concurring); Adams v. State, 34 Fla. 185, 195-96, 15 So. 905, 908 (1894); see generally Ehrhardt, supra, § 608(2), at 299-302. If the witness proves adverse, the calling party may lead and impeach the witness with prior inconsistent statements, provided the trial court first finds that the live testimony was affirmatively harmful to the calling party. § 90.608(2), Fla. Stat. However, "[a] mere lapse of memory is insufficient to render a witness adverse." Jackson, 451 So.2d at 462; Ehrhardt, supra, § 608(2), at 301. Nor does the fact that the witness may be hostile or unwilling render the witness adverse. E.g., Dudley, 545 So.2d at 860 *92 (Grimes, J., concurring) (citing Austin v. State, 461 So.2d 1380, 1383 (Fla. 1st DCA 1984)).
The court witness rule at issue here is a corollary of the adverse witness rule. It was designed for those instances where a party cannot vouch for the witness's credibility, yet the witness's evidence is so important that the interest of justice demands an evidentiary vehicle to have that person testify.[13] Because nobody can vouch for the witness's credibility, it is only fair that each party has the chance to challenge that person's testimony through cross-examination. As the Court said more than one hundred years ago, trial courts may call and examine witnesses of the court's own accord "when the interests of justice demand it, whether the witness be for or against the State, and in such a case to permit counsel on both sides to cross-examine such witness." Selph v. State, 22 Fla. 537, 545-46 (Fla. 1886) (emphasis supplied); see generally Ehrhardt, supra, § 615.1; McCormick on Evidence § 8 (3d ed. Lawyer's ed. 1984); IX Wigmore on Evidence § 2484 (J. Chadbourne ed. 1978). The rule is predicated on the principle that justice is best served when the trier of fact is exposed to all relevant evidence, presented in a fair and impartial manner, provided that the evidence is competent, reliable, trustworthy, and not otherwise excludable because of countervailing interests expressed in law, such as constitutional and statutory rights and privileges. Cf. § 90.402, Fla. Stat. (1987) ("All relevant evidence is admissible, except as provided by law."); Fed.R.Evid. 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."). A long line of cases decided by the Court have discussed the court witness rule with a varied degree of clarity and consistency. See, e.g., State v. Smith, 573 So.2d 306 (Fla. 1990); Dudley v. State, 545 So.2d at 859; Jackson v. State, 498 So.2d 906 (Fla. 1986); Brumbley v. State, 453 So.2d 381, 384 (Fla. 1984); Armstrong v. State, 399 So.2d 953 (Fla. 1981); McCloud v. State, 335 So.2d 257 (Fla. 1976); Olive v. State, 131 Fla. 548, 179 So. 811 (1938); Morris v. State, 100 Fla. 850, 130 So. 582 (1930); Brown v. State, 91 Fla. 682, 108 So. 842 (1926); Selph, 22 Fla. at 537.[14]
Because the court witness rule, like the adverse witness rule, is a narrow exception to the general witness interrogation rules, this Court historically has given it limited application:
Permitting a court to abandon its position of neutrality by calling a witness as its own was intended to prevent the manifest injustice which might occur if the testimony of an eyewitness to a crime was not placed before the jury because of the inability of either party to vouch for that witness. We believe that court witnesses should be limited to those situations where there is an eyewitness to the crime whose veracity or integrity is reasonably doubted.

Jackson, 498 So.2d at 909 (Fla. 1986) (emphasis supplied); see also Dudley, 545 So.2d at 857 (error to call non-eyewitness as court witness to introduce prior inconsistent statements about what he overheard); Brumbley, 453 So.2d at 384 (no error calling as court witness a participant/eyewitness to the criminal transaction); Olive, 131 Fla. at 548, 179 So. at 811 (no error calling eyewitness as a court witness); Morris, 100 Fla. at 850, 130 So. at 582 (same); Brown, 91 Fla. at 682, 108 So. at 842 (same).
The purpose of the rule is ill-served when a trial court grants a motion to call a witness as its own, thereby subjecting that witness to the rigors of cross-examination, without first establishing that *93 a sufficient basis exists to believe that the moving party cannot vouch for the witness's credibility. As we said in Smith, a party may move to have a witness called as a court witness if that party produces evidence, such as prior inconsistent statements, to show that the party cannot vouch for the witness's credibility. Smith, 573 So.2d at 313.
To be inconsistent, a prior statement must either directly contradict or materially differ from the expected testimony at trial. That includes allowing "witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." Jenkins v. Anderson, 447 U.S. 231, 238-39, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980). However, omissions must be of a material, significant fact rather than mere details.
Smith, 573 So.2d at 313. Under limited circumstances it may be enough to rely on counsel's representation that the party has made materially inconsistent statements, such as when opposing counsel does not dispute the claim. See, e.g., Brown, 91 Fla. at 682, 108 So. at 845. However, all too often this Court has reviewed cases where, without any factual finding about the witness's prior statements or credibility, the trial court invited error by calling court witnesses whose subsequent impeachment was used to introduce to the jury harmful, inadmissible substantive evidence of the defendant's guilt. See Smith, 573 So.2d at 312-14; Dudley, 545 So.2d at 857; Jackson, 498 So.2d at 906.[15]
Such is the case here. The state asserted at trial that it could not vouch for Greulich's credibility because she allegedly had given inconsistent statements. Over Shere's objection, the trial court allowed Greulich to testify as a court witness, relying on arguments of counsel without reviewing any of the prior statements, proffering Greulich's testimony, or examining any other evidence. Subsequently, a substantial portion of the state's cross-examination of Greulich focused on her prior statements in which she described what Shere did and said before and after the murder. Time and again, when she said she could not recall what happened, the state attempted to impeach her by reading to the jury her prior, unsworn, out-of-court statements that inculpated Shere.[16] It was improper to "impeach" Greulich with her prior statements after she merely said she did not remember what happened, especially when those statements had not been shown to be materially inconsistent. See Smith, 573 So.2d at 312-13.
The trial court also erred by calling Greulich as a court witness on the ground that she was hostile. Since the lack of credibility is the primary focus of the court witness rule, a showing of hostility *94 is not enough to warrant calling a court witness. Classifying a witness as hostile merely authorizes counsel to ask leading questions to induce an otherwise credible witness to testify  not to impeach. Allowing counsel to lead falls far short of authorizing counsel to challenge the credibility of the witness. See §§ 90.608, .612, Fla. Stat. (1987); Pitts v. State, 333 So.2d 109, 111 (Fla. 1st DCA 1976) ("A witness who is merely hostile may not be impeached by the party calling him."); see generally Ehrhardt, supra, § 608.2, at 299 ("The term `hostile witness' is not relevant to impeaching one's own witness, but only to whether a witness may be examined on direct examination with leading questions."); id. § 612.1; cf. Foremost Dairies, Inc., of the South v. Cutler, 212 So.2d 37, 40 (Fla. 4th DCA 1968) (The adverse witness rule of Florida Rule of Civil Procedure 1.450(a) allows a party to ask leading questions of a hostile witness, but "[n]othing in the rule ... permits that witness to be impeached or contradicted."); accord Fed.R.Evid. 611(c) ("When a party calls a hostile witness ... interrogation may be by leading questions.").
Hence, for the reasons stated above, the trial court erred by calling Greulich as a court witness, but the error was harmless.
Shere next raises two issues concerning the guilt-phase jury instructions. First, Shere argues that the trial court erred by instructing the jury with the standard short-form excusable homicide instruction rather than the standard long-form instruction. As Shere concedes, he neither objected to the short-form instruction, nor did he request the long-form instruction. For the reasons stated in our recent decisions in State v. Smith, 573 So.2d 306 (Fla. 1990), and State v. Schuck, 573 So.2d 335 (Fla. 1991), we find no merit in this claim. We also find no merit in Shere's argument that the trial court erred by giving the principal instruction. See, e.g., Hall v. State, 403 So.2d 1319 (Fla. 1981).
Next, we dispose of Shere's argument that the trial court erred by denying his post-trial motions for a jury interview and for a new trial related to alleged juror misconduct.[17] Shere's claims are predicated on an anonymous, typewritten letter to the editor of the St. Petersburg Times dated May 5, 1989, after Shere's trial ended. The letter, purportedly written by a member of Shere's jury, alleges that the writer did not know Shere could have been found guilty of the lesser offense of second-degree murder; that the jury "chair person" shared the writer's lack of understanding; that the death sentence was inappropriate in light of Demo's participation and conviction of second-degree murder in a separate trial for the same offense; that two jurors failed to disclose to "Judge O'Neil"[18] in voir dire that they knew Shere; and that a juror failed to disclose in voir dire that her brother had been murdered a few years ago, following which the murderer was convicted, sentenced, and "out on the street" seven years later.
Shere moved for a new trial pursuant to Florida Rule of Criminal Procedure 3.600(a)(3), which provides, in relevant part:
(a) The court shall grant a new trial if any of the following grounds is established:
... .
(3) That new and material evidence, that if introduced at the trial would probably have changed the verdict or finding of the court, and the defendant could not with reasonable diligence have discovered and produced upon the trial, has been discovered.
Shere also moved to interview the jury regarding the alleged misconduct. The trial court denied both motions.
The letter to the editor was wholly unsupported by any sworn affidavits or other evidence; it was anonymously sent to a *95 newspaper; it failed to name any of the jurors it accused; and there was no way the trial court reasonably could have identified the accused jurors to single them out for interviews. We conclude that the trial court did not abuse its discretion in refusing to grant the motion to interview the jury. Likewise, we find that the trial court was within its discretion to rule that the letter did not rise to the level required by rule 3.600(a)(3) to warrant a new trial.
Having found no reversible error in the guilt phase of the trial, we conclude that there is substantial competent evidence in the record to support Shere's conviction of first-degree murder.
Shere raises two claims in the penalty phase. First, he argues that the Florida death penalty statute is unconstitutional because the statutory aggravating and mitigating circumstances, as applied, do not adequately limit the class of persons eligible for the death penalty and thus render the death penalty susceptible to undue arbitrary and capricious application. This claim has been rejected previously, see, e.g., Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Smalley v. State, 546 So.2d 720 (Fla. 1989); Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), and merits no further discussion.
Shere's last claim attacks the trial court's penalty-phase instructions and findings. Initially, Shere argues that the court erred by instructing the jury to consider whether the murder was committed to disrupt or hinder the lawful exercise of a governmental function or law enforcement. See § 921.141(5)(g), Fla. Stat. (1987). We disagree. Substantial competent evidence properly introduced at trial supports beyond a reasonable doubt the finding that Shere and Demo plotted to kill Snyder because they believed Snyder had become a witness against them in an unrelated criminal case. See, e.g., Francis v. State, 473 So.2d 672, 677 (Fla. 1985), cert. denied, 474 U.S. 1094, 106 S.Ct. 870, 88 L.Ed.2d 908 (1986); Lara v. State, 464 So.2d 1173 (Fla. 1985). The trial court did not err in instructing the jury on a circumstance that was supported by the evidence.
Shere also argues that the trial court erred by finding the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. § 921.141(5)(i), Fla. Stat. (1987). Again we find substantial competent evidence to support the trial court's finding. This circumstance requires proof of heightened premeditation, that is, "the evidence must prove beyond a reasonable doubt that the defendant planned or arranged to commit murder before the crime began." Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990); see also, e.g., Rogers, 511 So.2d at 533. There is no evidence to reasonably suggest that Shere and Demo had any motive other than to kill Snyder. They discussed killing Snyder before the murder, they obtained a shovel to bury the body, then they took Snyder to an isolated location where Snyder was shot ten times. See, e.g., Francis, 473 So.2d at 677; Lara, 464 So.2d at 1173.
We are not convinced, however, that the evidence supports the trial court's finding as to the circumstance of especially heinous, atrocious, or cruel. § 921.141(5)(h), Fla. Stat. (1987).[19] As this Court recently explained, "[t]he factor of heinous, atrocious or cruel is proper only in torturous murders  those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Cheshire v. State, 568 So.2d 908, 912 (Fla. 1990) (citing State v. Dixon, 283 So.2d 1 (Fla. 1983), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974)).
The state relies on Troedel v. State, 462 So.2d 392 (Fla. 1984), and Swafford v. State, 533 So.2d 270 (Fla. 1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 *96 L.Ed.2d 944 (1989). Troedel was a double homicide in which the two victims were shot together. One of the victims had a defensive wound, and evidence showed that he "was deliberately tormented before being killed." In Swafford, the victim was abducted and transported four miles to an isolated location where she was brutally, sexually battered before being shot nine times. The evidence in both Troedel and Swafford supported findings that the killers desired to inflict a high degree of pain, or enjoyed or were utterly indifferent to the suffering they caused. The victims were conscious, had time to apprehend imminent death, and were subjected to brutality before they died. See, e.g., Campbell v. State, 571 So.2d 415, 418 (Fla. 1990) (circumstance established with proof that two victims stabbed together, and the decedent was stabbed twenty-three times over the course of several minutes and had defensive wounds); Nibert v. State, 574 So.2d 1059, 1061 (Fla. 1990) (circumstance established with evidence that victim had seventeen stab wounds, some of which were defensive wounds, and the victim remained conscious throughout the stabbing).
The evidence does not rise to that level in this case. The record shows that Snyder had no way of knowing before the first shot was fired that Demo and Shere took him hunting to murder him, so there was no prolonged apprehension of death. Without warning, either Shere or Demo or both fired a rapid succession of gunshots at Snyder from close range with two weapons. The killing took place quickly, and there is no evidence that Snyder experienced pain or prolonged suffering. There is no evidence that he remained conscious throughut the shooting, and the first shot could have struck his head. Likewise, there is no evidence to suggest that Shere desired to inflict a high degree of pain. Four of the wounds were potentially fatal, which is an indication that they tried to kill him, not torture him. There was no testimony that any of the wounds were defensive in nature. Moreover, the fact that multiple gunshot wounds were inflicted is not, by itself, sufficient to support a finding of heinous, atrocious, or cruel. Thus, there is insufficient evidence in this record to conclude that this aggravating circumstance was proved beyond a reasonable doubt.
Having rejected one of the aggravating circumstances, we must determine the effect of the error by examining the valid aggravating and mitigating circumstances. In its findings, the trial court reviewed the mitigating evidence and found only one statutory circumstance: that Shere was twenty-one years old when Snyder was murdered. As to nonstatutory mitigating circumstances, the trial court summarized the mitigating evidence and rejected it, concluding that "the only appropriate sentence is death." We have carefully reviewed the record and find substantial competent evidence to support the trial court's rejection of the mitigating circumstances. See Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990) (trial court may reject defendant's claim that a mitigating circumstance has been proved if the record contains substantial competent evidence to support that conclusion).
Thus, we are left with very little mitigation and the two valid aggravating circumstances of cold, calculated, and premeditated murder; and murder committed to disrupt or hinder the lawful exercise of a governmental function or law enforcement. The jury recommended death on evidence that proved this was a cold-blooded, premeditated murder designed and carried out to eliminate a witness to an earlier crime. Under the circumstances of this case, we conclude that the trial court would have imposed the same sentence had it found that the aggravating circumstance of heinous, atrocious, or cruel had not been established. Hence, we find the error harmless beyond a reasonable doubt. See Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Preston v. State, 564 So.2d 120 (Fla. 1990).
For the reasons stated above, we affirm the conviction and sentence of death.
It is so ordered.
*97 SHAW, C.J., and OVERTON, McDONALD, GRIMES and KOGAN, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] One of the statements was recorded, and that recording was played to the jury. Detective Alan Arick related to the jury the contents of Shere's other statements.
[4] Heidi Greulich said that subsequent to the murder, she and Shere married, and she testified under the name Heidi Greulich Shere.
[5] See § 921.141(5)(g), Fla. Stat. (1987).
[6] See id. § 921.141(5)(h).
[7] See id. § 921.141(5)(i).
[8] Shere's claim that the trial court erred in denying his motion for appointment of private counsel has no merit and warrants no discussion here. We also find no abuse of discretion in the trial court's denial of a motion to exclude a photograph of the victim's body. See, e.g., Jackson v. State, 545 So.2d 260, 265 (Fla. 1989).
[9] Section 90.615(1) of the Florida Statutes (1987) provides:

90.615 Calling witnesses by the court. 
(1) The court may call witnesses whom all parties may cross-examine.
[10] Section 90.608 of the Florida Statutes (1987) provides:

90.608 Who may impeach. 
(1) Any party, except the party calling the witness, may attack the credibility of a witness by:
(a) Introducing statements of the witness which are inconsistent with his present testimony.
(b) Showing that the witness is biased.
(c) Attacking the character of the witness in accordance with the provisions of s. 90.609 or s. 90.610.
(d) Showing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which he testified.
(e) Proof by other witnesses that material facts are not as testified to by the witness being impeached.
(2) A party calling a witness shall not be allowed to impeach his character as provided in s. 90.609 or s. 90.610, but, if the witness proves adverse, such party may contradict the witness by other evidence or may prove that the witness has made an inconsistent statement at another time, without regard to whether the party was surprised by the testimony of the witness. Leading questions may be used during any examination under this subsection.
Section 90.612 of the Florida Statutes (1987) provides:
90.612 Mode and order of interrogation and presentation. 
(1) The judge shall exercise reasonable control over the mode and order of the interrogation of witnesses and the presentation of evidence, so as to:
(a) Facilitate, through effective interrogation and presentation, the discovery of the truth.
(b) Avoid needless consumption of time.
(c) Protect witnesses from harassment or undue embarrassment.
(2) Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in its discretion, permit inquiry into additional matters.
(3) Except as provided by rule of court or when the interests of justice otherwise require:
(a) A party may not ask a witness a leading question on direct or redirect examination.
(b) A party may ask a witness a leading question on cross-examination or re-cross examination.
[11] Federal law follows a different rule. Compare §§ 90.608,.612, Fla. Stat. (1987), with Fed. R.Evid. 607, 611.
[12] rule against a party impeaching his own witness, sometimes called the `voucher rule,' is retained in Section 90.608(1). The drafters of the [Florida Evidence] Code considered repealing the common law rule and allowing a party to impeach his own witness; however, they determined that generally counsel should not call a witness whom he knew was not testifying truthfully and proceed to impeach that person.
C. Ehrhardt, Florida Evidence § 608.2, at 298 (2d ed. 1984).
[13] We are concerned here only with subsection 90.615(1) of the Florida Statutes (1987), authorizing courts to call witnesses to testify. We do not comment on subsection 90.615(2) of the Florida Statutes (1987), which authorizes courts to interrogate witnesses.
[14] The Florida Legislature codified the common law rule in 1976. Jackson v. State, 498 So.2d 906, 908 n. 1 (Fla. 1986).
[15] Even if Greulich's prior statements had been properly introduced for impeachment, the relevance of those statements would have been limited to the credibility of the witness and not as substantive evidence of Shere's guilt. We addressed that issue in State v. Smith, 573 So.2d 306 (Fla. 1990), Dudley v. State, 545 So.2d 857 (Fla. 1989), and Jackson v. State, 498 So.2d 906 (1986).
[16] For example, when the prosecutor asked Greulich if she overheard the telephone conversation between Shere and Demo, the following colloquy took place:

A [Greulich] I heard bits and pieces of things. I really could not recall right now.
Q [Prosecutor] You heard him say, "I can't believe Drew would turn state's evidence against me, but it seems right because he hadn't been arrested on the charge," and he thinks maybe Drew turned Brewster in for something, too. You heard him say that?
A I cannot recall at this time. It may be possible.
Q Ma'am, do you recall giving a statement to Alan Arick and James Blade of the Hernando County Sheriff's Office on January 15, 1988?
A Yes, I do.
Q You recall Detective Blade asking you what was  what did the conversation about Drew  what did you hear, and you repeated the words I just read to you?
A That could be. I have not looked over the depositions. None were given to me.
Q Would you doubt that's what it says? Would you like to look at it?
A No, thank you.
It is evident from the record that much of the state's examination of Greulich was designed to elicit otherwise inadmissible out-of-court statements as substantive evidence against Shere. We condemned that practice in Smith, Dudley and Jackson, and we find need to do so again here.
[17] Shere also argues that a new trial should be granted on the basis of a hearsay statement disclosed in a sworn affidavit executed by jail inmate Frank DeMotte. We find no merit in this claim either on its own merits or in conjunction with the other ground we rejected above.
[18] The trial judge's name was "McNeal."
[19] The trial court found that the murder was "especially evil, wicked, atrocious, or cruel." We find no merit in Shere's claim that the trial court's failure to precisely track the language of section 921.141(5)(h) of the Florida Statutes (1987) created confusion on these facts.